**In the Matter of 1025 ASSOCIATES, INC., Debtor.**

**WILMINGTON SAVINGS FUND SOCIETY, Plaintiff,**

v.

**1025 ASSOCIATES, INC., Defendant.**

**Bankruptcy No. 89–325.
Motion No. 89–111.**

United States Bankruptcy Court, D. Delaware.

Nov. 14, 1989.

Randall E. Robbins, Jeffrey S. Welch, Wilmington, Del., for plaintiff.

Thomas D. Runnels, Newark, Del., for debtor.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

Wilmington Savings Fund Society (WSFS) has moved for relief from the auto-

matic stay under 11 U.S.C. § 362(d) to continue its foreclosure action in Delaware Superior Court against debtor's real property and principal asset.

*Background*

Debtor 1025 Associates, Inc. (1025), t/a Reagan's Tavern, operates a neighborhood bar and grill with package store at 1025 Chestnut Street in Wilmington, Delaware. The debtor's real estate consists of a three-story brick and frame building situated on a corner lot in a primarily ethnic, residential neighborhood with some commercial mix. Presently, the tavern/restaurant transacts business on the first floor of the premises while the second and third floors each have an apartment in the process of renovation. This property has historically been used as a tavern since 1889, under various owners, with the apartments having been leased since the days of Prohibition to provide rental income. There is also a detached garage at the rear of the property as well as a basement which services the bar/taproom.

1025 is a Delaware corporation with Karl Weldin being the company's sole officer, director and shareholder. The building at 1025 Chestnut Street, the corporation's primary asset, was purchased along with the tavern business by 1025 on August 1, 1981, for $135,000. It should be noted that the deed conveying the property recites only $65,000 consideration for the premises; thus, 1025 appears to have paid $70,000 for the liquor license and the going-concern value of the tavern business. Mr. Weldin testified that the 100–year old building was extremely run down; therefore, improvements were commenced to the property, especially to the tavern on the first floor. Some of these improvements were a new roof in 1982, installing four air conditioning units, repaneling and retiling the tavern area, revamping the tavern's kitchen and restrooms, and installation of a 48–inch rear projection screen television in the bar. In addition, new furniture for the taproom and other equipment and fixtures were purchased. As for the apartments upstairs, these were rented initially after 1025's purchase of the premises for $150 and $85 per month for the second and third floors, respectively. Subsequently, some cosmetic improvements were made and they were re-rented for $300 and $195—more than double the previous rental.

In order to finance some of these renovations, 1025 executed and delivered a note and mortgage to WSFS for $27,500 on December 10, 1984. With these funds, most of the renovations to the tavern were completed by 1987. From the time of purchase, it was 1025's intention to rehabilitate the upstairs apartments. In this regard, Weldin approached WSFS once again in mid–1987 to obtain financing for apartment renovation, and on November 23, 1987, 1025 entered into a Building Loan Agreement which was executed along with a mortgage and note for $142,650. The Building Loan Agreement provided that 1025 would pay off the original PMM held by the previous owner and two WSFS loans which totalled about $99,500, and WSFS would fund $43,000 for the apartment improvements. Still, the renovations had to be completed within seven months of the agreement; furthermore, the final $8,000 would be held back until a Certificate of Occupancy was issued for the apartments. Finally, 1025 had to present the receipts to WSFS to get a draw from the renovation proceeds.

Although the mortgage contains a legal description of the premises, it does not contain the city, county, or state where the property is located; however, the acknowledgement on the last page of the mortgage does mention the county and state of acknowledgement.

1025 began its renovations in the upstairs apartments by totally gutting them. Despite Mr. Weldin's experience in the construction business, the project fell seriously behind and the seven-month deadline in the Building Loan Agreement passed. WSFS paid 1025 based on its receipts from the rehabilitation in two payments of $12,000 and one payment of $10,000 for a total of $34,000, but it did not pay the other $8,000 on the loan since no Certificate of Occupancy was issued. Cost overruns, compliance with housing safety codes, and unexpected

difficulties inherent in renovating an old property were some of the reasons the project was delayed. In addition, the tavern business took a 20½% drop in 1988 due to competition and personnel problems. Consequently, the construction project upstairs did not receive the additional income needed to supplement the draw for apartment renovation. As a result, 1025 fell in arrears of its loan payments, and the renovation project is only about 30% complete.

On March 8, 1989, WSFS sent Mr. Weldin on behalf of 1025 a notice of default informing him that both loans were past due and that the balance on both were now due. When 1025 failed to bring current the two mortgages, WSFS began foreclosure proceedings on March 28. Although 1025 filed an answer to the foreclosure complaint, WSFS moved for default judgment based on a procedural defect. 1025 filed its Chapter 11 petition on June 6, 1989, before the scheduled hearing in Superior Court that very day. WSFS filed its motion for relief from the automatic stay on June 9.

As of the hearing date, August 23 and 24, 1025 owed the following on the 1984 $27,500 mortgage (First Mortgage) and the 1987 $142,650 mortgage (Second Mortgage).

### First Mortgage

| | |
|---|---|
| Principal | $12,113.14 |
| Past Due Interest | $ 993.82 |
| Late Charges | $ 158.56 |
| Legal Fees | $ 655.35 |
| Total Due on First Mortgage | $13,920.87 |
| Per Diem Rate of Interest | $4.21 |

### Second Mortgage

| | |
|---|---|
| Principal | $132,601.17 |
| Past Due Interest | $ 16,178.13 |
| Late Charges | $ 928.60 |
| Legal Fees | $ 7,438.96 |
| Total Due on Second Mortgage | $157,146.86 |
| Per Diem Rate of Interest | $46.04 |

The aggregate amount of the two mortgages is $171,067.73 and with interest accruing, the sum now exceeds $175,000. Additionally, 1025 owes approximately $4,000 in back federal, county, and city taxes. The tavern business seems to have a slight albeit uneven positive cash flow, except for August where it lost $1,025. Except for taxes, no other claims have been filed against the estate.

Before reaching the question of whether relief from stay is appropriate, two preliminary issues must be resolved. They are WSFS's allegations of fraud and the validity of the Second Mortgage due to the insufficiency of the instrument's property description.

### WSFS's Allegations of Fraudulent Conduct of Debtor's Principal

WSFS contends 1025's president, Karl Weldin, acted fraudulently by diverting funds away from the rehabilitation of the apartments and putting them toward personal use. Though fraud might justify relief for cause under 11 U.S.C. § 362(d)(1), the record reveals no hard evidence substantiating these charges. WSFS's allegation of Weldin's misappropriations are based mainly on the estimates of its appraiser that $8,000 to $9,000 was unaccounted for based on the renovation completed taking into account the amount of the loan. This is insufficient to prove fraud. The elements of fraud are (1) that materially false representations were made; (2) representations were made with the intention and purpose of deceiving the creditor; (3) the creditor relied on the representations; and (4) the creditor was damaged as a proximate cause of the representation. *Whiting v. Pacific Finance Discount Co., (In re Whiting)*, 10 B.R. 687, 689 (Bankr.E.D.Pa.1981). The only misrepresentations made by Weldin are a couple of receipts presented to WSFS to draw on the loan which were not directly related to the apartment renovations, some for example, a flat tire repair and a "dust buster", but most of these "unrelated" receipts were for tavern improvements which were implicitly covered in WSFS's June 23, 1987 commitment letter for the Second Mortgage. In any event, the expenditures are insubstantial compared with the overall loan amount. Though 1025 may have breached its Building Loan Agreement with WSFS, this fact alone does not constitute fraud. Undoubtedly, Mr. Weldin made some bad business decisions on behalf of 1025 which may have delayed the renova-

tion; yet, absent tangible evidence of fraud, he is insulated from direct liability by virtue of his one-person "shell" corporation and the lack of a personal guaranty which would bind him. Accordingly, WSFS's allegations must be dismissed because it has failed to prove the debtor's principal's misappropriation of the loan proceeds.

*Validity of WSFS's Second Mortgage*

■ 1025 contends that the Second Mortgage held by WSFS is invalid because the property description, aside from the metes and bounds description, does not also include the city, county, and state where the mortgaged premises are located. Buttressing this contention, 1025 argues that the Second Mortgage is defective in form because it violates the statutory format contained in *Del.Code Ann.*, tit. 25 § 2101(a). Mortgages complying with this statutory form operate as an effective mortgage lien pursuant to § 2101(b) if duly executed, acknowledged, and recorded. If the mortgage is unperfected, 1025 as debtor-in-possession can utilize the "strong-arm" provision of 11 U.S.C. § 544(a)(3) to avoid the security interest. Specifically, 1025 can avoid the mortgage only if applicable state law would allow a bona fide purchaser of the real property to avoid it by virtue of the defective description in the mortgage. *See Hargrave v. LaPalomento (In re LaPalomento),* 29 B.R. 291 (Bankr.D.N.J. 1983).

■ In general, descriptions of real estate in mortgages must conform to those requisites prevailing with respect to descriptions in deeds; thus, mortgages should describe the property covered with sufficient certainty in order to be effective. *E.g., Gulf Coast Investment Corp. v. McClanahan (In re Vezinot),* 20 B.R. 950 (Bankr.W.D.La.1982). Though there is no Delaware authority that has addressed the particular issue at bar, the better reasoned decisions hold that omission of a city, county, or state will not invalidate the mortgage instrument *per se* provided that other means of adequate identification exist. *Smith v. Green,* 41 F. 455 (C.C.D.Minn.

1889); *Wilson v. Calhoun,* 157 Tenn. 667, 11 S.W.2d 906 (1928). *See generally* 59 C.J.S. *Mortgages* § 108 (1949); 55 Am. Jur.2d *Mortgages* § 123 (1971). Essentially, these cases look to indicators within the four corners of the mortgage whereby the city, county, or state can be deduced from other locality references such as the acknowledgement or the residences of the parties. Still, third parties searching the title records for mortgages are not bound to look far beyond the mortgage record unless the mortgage itself refers to another record. *See Conly v. Industrial Trust Co.,* 29 A.2d 601 (Del.Ch.1943). *See, e.g., Wilson v. Boyce,* 92 U.S. 320, 325, 23 L.Ed. 608, (1875) ("The generality of its language forms no objection to the validity of the mortgage ... A mortgage 'of all my property,' like the one we are considering, is sufficient to transfer title."). Constructive notice of a mortgage is notice of whatever matters one would learn by any inquiry that the recitals of the instrument made it one's duty to pursue. *Cf. Cashvan v. Darling,* 107 A.2d 896 (Del.Ch.1954) (applying this rule to deeds).

■ Applying these principles to the instant mortgage, it is clear that the debtor's argument that the property description lacks specificity must be rejected. Here, the acknowledgement on the last page of the mortgage clearly states "State of Delaware" and "New Castle County"; in addition, the debtor 1025 is plainly denoted as a Delaware corporation on the first page of the mortgage. Finally, the legal description itself names two streets, i.e., Chestnut and Van Buren; a cursory examination of a map of New Castle County, Delaware reveals that these streets intersect only in the City of Wilmington. Consequently, the additional identification references supplement the bare legal description upon these facts to provide a sufficient description although, as a matter of course, the city, county, and state should *always* be included in any mortgage instrument to fully describe the collateral.

■ Similarly, 1025's contention that the mortgage failed to comply with the suggested statutory form is also inapposite.

Title 25, § 2101(a) of the Delaware Code states only that "[t]he following *shall be a sufficient form* of mortgage for the purpose of creating a lien on real estate within this State ..." (emphasis added). There is no language in this section to indicate that this form is required or otherwise mandated. This interpretation is supported by *Del.Code Ann.* tit. 25 § 2101(c) which states that *"[n]othing herein contained shall invalidate a mortgage not made in the above form,* but a mortgage made in the form heretofore in common use within this State shall be valid and effectual." (emphasis added). As a practical matter, many mortgage companies are multistate entities which may desire to employ a standard mortgage form either for regional use or for convenience in selling to the secondary mortgage market. A plain and common sense interpretation of the statute indicates that the format is suggestive rather than mandatory, except for the necessary technical components of a mortgage such as the amount of debt, description of premises, acknowledgement, seal, etc. *See, e.g., Monroe Park v. Metropolitan Life Ins. Co.,* 457 A.2d 734 (Del.1983) (mortgage must be sealed to be enforceable at law, but an unsealed mortgage is still enforceable in equity). As a result, 1025's statutory argument must also fail and, thus, it may not use its avoidance powers to attack the secured status of the Second Mortgage lien.

*Relief from Stay*

■ Section 362(d) of the Code provides that relief shall be granted either (1) for cause, including lack of adequate protection of an interest in property OR (2) if the debtor lacks equity in the property and it is not necessary for an effective reorganization. The party requesting relief, WSFS, has the burden of proof as to 1025's equity. § 362(g). On all other issues—adequate protection and feasibility of reorganization —1025 must shoulder the burden of proof.

Real Estate Services, Ltd., a subsidiary of B. Gary Scott, Inc., which, in turn, is a subsidiary of WSFS, placed the fair market value of the real estate at $100,000 without the liquor license, $130,000 with the liquor license, and $161,500 with both the liquor license and apartment renovations completed. In addition, it was estimated that $45,000 would be needed to complete the renovations which were only 30% complete. 1025 presented no rebuttal testimony either by an appraiser or by Mr. Weldin who could have testified as to value. *See State ex rel. Smith v. 0. 15 Acres of Land,* 169 A.2d 256 (Del.1961).

However, Mr. Weldin did testify that he estimated the going-concern value of Reagan's Tavern to be $150,000 solely as a business apart from the real estate. This estimate seems extremely high in view of the nominal cash flow the business has been generating recently. Admittedly, numerous improvements were made to the bar and kitchen areas between 1981–87, but most of these affected the real estate itself and added to the business' value incidentally. In any event, WSFS's collateral is against the real estate—not the business— and, therefore, the net worth of the corporation does not factor in computing the debtor's equity in the premises even though it might be relevant in determining the feasibility of reorganization.

Under § 362(d)(1), adequate protection exists if the value of WSFS's collateral exceeds the value of its claim and the difference is either great enough to absorb interest accrual or the debtor is servicing the debt. *Matter of Grantsville Hotel Assocs., L.P.,* 103 B.R. 509, 510 (Bankr.D.Del 1989). The facts on the record show the property without the liquor license is worth $100,000 ($130,000 with the liquor license) while WSFS's mortgage liens exceed $175,000. Obviously, WSFS is undersecured. As for debt service, 1025 has made no mortgage payments for many months, over 1½ years on the Second Mortgage. Finally, the two unfinished apartment units are sitting without heat, walls, or flooring and might be damaged in the event of cold or severe weather due to the lack of heat and electricity. This exposure of the property is additional grounds for finding that the interest of WSFS is not adequately protected. Thus, WSFS is entitled to relief from stay under § 362(d)(1) for cause.

Though § 362(d) is written in the disjunctive and a ruling under either subsection (d)(1) or (d)(2) is all that is necessary for relief, the court will also address the elements required for relief under subsection (d)(2). Subsection (d)(2)(A) has already been satisfied by WSFS in that it has shown that 1025 has no equity in the Chestnut Street premises. Under § 362(d)(2)(B), debtor must demonstrate that an effective reorganization is realistically possible. *In re Park Timbers*, 58 B.R. 647, 651 (Bankr. D.Del.1985). 1025's plan appears to be to sell the tavern business with leasing the first floor and basement for its operation and use the proceeds to finish the renovation of the upstairs apartments. The business was listed with Stoltz Realty for six months and 1025 has since repeatedly advertised the sale of the tavern in the newspaper; however, no apparent offers or proposals have yet been made. Additionally, debtor's counsel failed to file the disclosure statement and plan by September 30, 1989 as asserted during the hearing on this motion. Debtor has had its "breathing spell." Though the tavern business seems to be holding its own, the overall circumstances suggest that the feasibility of reorganization is unlikely anytime soon. Therefore, the combination of lack of equity in 1025 and its inability to demonstrate any likelihood of an effective reorganization requires that WSFS be granted relief under § 362(d)(2).