HANDLER CONSTRUCTION, INC., a
Delaware Corporation, Defendant
Below, Appellant,

v.

CORESTATES BANK, N.A., Successor by
Merger to the First Pennsylvania Bank,
N.A., Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Sept. 28, 1993.
Decided: Dec. 1, 1993.

minations by the Commissioner or the Court of Chancery are required. *See* n. 10 herein.

David Roeberg of Roeberg & Associates, P.A., Wilmington, for appellant.

A. Gilchrist Sparks, III (argued), and William M. Lafferty of Morris, Nichols, Arsht & Tunnell, Wilmington, for appellee.

Before VEASEY, C.J., HORSEY, and HOLLAND, JJ.

HOLLAND, Justice:

This is a direct appeal from a final judgment entered by the Court of Chancery. These proceedings originated when the plaintiff-appellee, CoreStates Bank, N.A. ("CoreStates"), filed a complaint in equity to foreclose upon an unsealed mortgage. That unsealed mortgage had been executed and recorded in favor of CoreStates' predecessor in 1988. The defendant-appellant, Handler Construction, Inc. ("Handler"), is the assignee of a sealed mortgage on the same property which was executed and recorded in 1990. The Court of Chancery held that the sale of the mortgaged property, pursuant to CoreStates' equitable action to foreclose upon its unsealed mortgage, extinguished the lien of the subsequently recorded sealed mortgage, which had been assigned to Handler.

Handler has raised two basic contentions in this appeal. First, according to Handler, notwithstanding its express terms and recordation, an unsealed document can never be a "mortgage," as a matter of Delaware law. Second, Handler argues in the alternative that even if a recorded unsealed document can be a "mortgage," it cannot take priority over a subsequently recorded sealed mortgage executed in favor of a third party.

This Court has carefully considered Handler's arguments. We have concluded that both of Handler's contentions are contrary to the venerable equity jurisprudence of Delaware. Accordingly, the final judgment of the Court of Chancery, which extinguished Handler's legal mortgage as a lien which was subordinate to CoreStates' prior recorded equitable mortgage, is affirmed.

*Facts*

The relevant facts are, for the most part, undisputed. On July 21, 1988, Hitchens Farm Associates obtained a loan in the amount of $15,263,000 from First Pennsylvania Bank, N.A. ("First Pennsylvania"). As security it executed an unsealed mortgage on a parcel of real property known as "Hitchens Farm." That mortgage was recorded in New Castle County, Delaware on July 25, 1988.

On February 21, 1990, Hitchens Farm Associates executed a sealed mortgage on Hitchens Farm in favor of Francis J. Grossi ("Grossi") and Joseph A. Vilone ("Vilone") for $1,450,000. This mortgage was recorded on March 12, 1990. In May 1991, Grossi and Vilone signed a letter acknowledging their agreement to a proposed workout plan between First Pennsylvania and Hitchens Farm Associates. The letter referred to First Pennsylvania's mortgage as a first mortgage and to Grossi and Vilone's interest as a junior mortgage.

On October 24, 1991, CoreStates, successor by merger to First Pennsylvania, commenced an action on its unsealed mortgage against Hitchens Farm Associates in the Court of Chancery. Grossi and Vilone, though not joined as defendants, were given notice of the action. Hitchens Farm Associates consented to the entry of judgment. The Court of Chancery issued an order on December 23, 1991, granting judgment against Hitchens Farm Associates for $5,040,535.43 and directing the Prothonotary of New Castle County to "enter the judgment in the same manner and form and in the same books and indexes as a judgment by default in a scire facias proceeding," with the "same force and effect as though the judgment had been entered in Court pursuant to the scire facias sur mortgage procedure."

On January 2, 1992, at CoreStates' request, the Prothonotary issued a writ of execution and scheduled a sheriff's sale for March 10, 1992. Fifteen minutes prior to the sale, Handler recorded an assignment of mortgage from Grossi and Vilone. Handler attended the sale. At the sale on March 10, 1992, the Sheriff sold the property to CoreStates, the sole bidder, for $5 million.

On April 13, 1992, Handler commenced a Superior Court mortgage foreclosure action against Hitchens Farm Associates and CoreStates. That action challenged the priority of CoreStates' mortgage. On May 6, 1992, CoreStates filed a motion in the Court of Chancery to join Handler as a defendant, for confirmation of the March 10 sale, and for an adjudication that Handler's mortgage was discharged by the sale.

■ The motion to join Handler was granted. On July 29, 1992, the Court of Chancery issued an opinion holding that the CoreStates mortgage had priority over Handler's mortgage, but denying CoreStates' motion to confirm the March 10 sheriff's sale because the December 23, 1991 order authorizing the sale was ambiguous. According to the Court of Chancery, that order could be read to have erroneously directed the Prothonotary to enter the judgment as a "judgment by default in a *scire facias* proceeding," which is not available in an equitable foreclosure.[1]

■ The Court of Chancery also ruled, however, that upon submission of a new order by CoreStates, it would modify the December 23, 1991 order *nunc pro tunc* and direct a new sheriff's sale to be held pursuant to 10 *Del.C.* § 371, unless CoreStates chose to have the March 10, 1992 sale confirmed, in which event Hitchens Farm would have remained subject to Handler's mortgage.[2] The Court of Chancery also held that it would be "grossly inequitable" to confirm the March 10, 1992 sale and permit the Handler lien to remain undischarged. That holding had two bases: first, the clear purpose of the December 23 order was to accomplish this discharge; and second, Grossi and Vilone "agreed in writing before the equitable foreclosure proceeding was commenced that the second mortgage was subordinate to the first mortgage."[3]

Accordingly, the Court of Chancery issued a new order on August 25, 1992, modifying the December 23, 1991 order *nunc pro tunc* and authorizing a second sheriff's sale. That sale was held on November 10, 1992 and was confirmed by the Court of Chancery on December 18, 1992. The final judgment entered by the Court of Chancery provided

---

1. Handler contends that the Court of Chancery lacked subject matter jurisdiction to deny confirmation of the March 10, 1992 sheriff's sale because the matter had been transferred to the Superior Court by the Court of Chancery's December 23, 1991 order. This contention is without merit. The Court of Chancery's December 23, 1991 order directed that the *judgment* be transferred to the records of the Superior Court. 10 *Del.C.* § 4734. Hence, the Court of Chancery retained jurisdiction over *the cause of action*.

2. Handler contends that the Court of Chancery erred in its *nunc pro tunc* amendment of its December 23, 1991 order to delete certain paragraphs and substitute new ones. The authority to enter a judgment *nunc pro tunc*, which is applied to acts allowed to be done after the time they should have been done, with retroactive effect, is "limited to corrections of clerical errors or ministerial defects to the end that the original intention of the Court will be implemented." *Angelli v. Sherway*, Del.Supr., 560 A.2d 1028, 1034 n. 2 (1989). This Court reviews the entry of judgments *nunc pro tunc* for abuse of discretion. *See Pitts v. White*, Del.Supr., 109 A.2d 786, 788 (1954).

The amendment challenged by Handler modified the December 23, 1991 order, which had authorized the March 10, 1992 sheriff's sale. The Court of Chancery's decision to modify the order to effectuate its intent was a ministerial act. The amendment did not alter the intent of the order, which had been to effectuate an equitable foreclosure. 10 *Del.C.* § 371. Thus, it did not affect the material rights of the parties.

3. Handler argues that the Court of Chancery erred in its failure to confirm the March 10, 1992 sheriff's sale, because the decision on confirmation was contingent only on whether the defaulting obligor had received just treatment in the execution process, and not on the issue of whether it was proper for a junior lien to survive the sale. Alternatively, Handler contends that because the Court of Chancery was not aware of the then-Grossi and Vilone mortgage at the time it entered the December 23, 1991 order, it could not have considered and adjudicated the priority status of CoreStates' lien.

These contentions are without merit. Because the March 10, 1992 sheriff's sale was undertaken pursuant to the ambiguous December 23, 1991 order, it was clearly proper for the Court of Chancery not to confirm it. Moreover, the Court of Chancery's July 29, 1992 opinion and order denying confirmation specifically addressed the priority given to CoreStates' lien and the equitable bases for its decision, including factors directly related to the Handler mortgage. Therefore, the Court of Chancery did not abuse its discretion by refusing to confirm the March 10, 1992 sheriff's sale. *See Pitts v. White*, Del.Supr., 109 A.2d 786, 788 (1954).

that Handler's mortgage was discharged. 10 Del.C. § 4985. This appeal followed.

### Equitable Mortgages
### Nature and History

The Anglo–Saxon/American history of the law regarding mortgages reflects the equitable nature of its present principles, many of which find their origin in Roman civil law. Those equitable tenets were developed over centuries by courts of equity, in response to what were perceived to be the shortcomings of legal rules on the subject. *See Fox v. Wharton*, Del.Ch., 5 Del.Ch. 200, 225–26 (1878). The Delaware Court of Chancery has characterized the law of mortgages as "one of the most splendid instances in the history of our jurisprudence, of the triumph of equitable principles over technical rules, and of the homage which those principles have received by their adoption in the courts of law." *Id.* at 226 (quoting 4 Kent, *Commentaries on American Law* *158). A knowledge of that history is essential to an understanding of the powers which are now vested in the Delaware Court of Chancery in equitable foreclosure proceedings.

The Roman civil law recognized two kinds of transfers of property as security for debts: the *pignus* and the *hypotheca*. 2 Story, *Commentaries on Equity Jurisprudence* § 1005 (Bigelow, 13th ed. 1886). The *pignus*, or pledge, involved the pledge of real or personal property for money lent, and the possession of the property was passed to the creditor upon the condition of returning it to the owner when the debt was paid. *Id.* The *hypotheca* involved the pledge of real or personal property in which the thing pledged was not delivered to the creditor, but remained in the possession of the debtor. *Id.* The *hypotheca* provided that upon default of

the debtor *hypotheca*, the creditor was entitled to an *actio hypothecaria*, an action *in rem* to obtain possession of the encumbered property. *Id.* § 1007. The debtor, however, was entitled to due notice and opportunity to satisfy the debt and retain the property before his rights were extinguished, and the pledge could not be sold without protracted notice or a judicial decree. 4 Kent, *Commentaries on American Law* *136 n. (a) (Barnes, 13th ed. 1884).

The common law of mortgages can be traced back "to the gage of land or chattels of the Saxon and early Norman periods, involving the transfer of possession to creditors to secure the payment of debts." Walsh, *A Treatise on Mortgages* 1 (1934). Several references to such gages can be found in the Domesday Book. *Id.* (citing Domesday Book 137, 141, 217). In his twelfth century treatise on the common law of the King's Court, Glanville described the distinction which had developed between a *mortuum vadium*, or *mort gage*, and a *vivium vadium*, or *vif gage*. *Id.*[4]

By the fifteenth century, the common law form of mortgage in England had evolved into "the form of a conveyance in fee to the mortgagee subject to payment of the debt as a condition subsequent, performance of which gives to the mortgagor a right to re-enter restoring his estate." *Id.* at 4. Conversely, a default in such payment was used to make the title of the mortgagee absolute. *Id.* Thus, the term "mortgage" described a gage "which is dead to the mortgagor because if he fails to pay the debt on the due day, he loses his land forever." *Id.*

The impetus for the adoption of equitable doctrines in the Courts of Chancery arose from the harsh rules by which the "death" of

---

4. In his treatise on mortgages, Professor Glenn discusses the distinction drawn by early English writers such as Glanville between *vivium vadium* ("living gage") and *mortuum vadium* ("dead gage," a.k.a. mortgage), both of which presumed the transfer of possession to the creditor. 1 Glenn, *Mortgages, Deeds of Trust, and Other Security Devices as to Land* § 2 (1943). In the former arrangement, the creditor would agree to pay himself out of the rents and proceeds of the pledged property, without recourse against the debtor or against the land for payment of the debt. *Id.* § 2, at 4–5. On the other hand, in a

conveyance *mortuum vadium*, the creditor would not only collect the income of the land without accountability, but also have the right to look to the debtor and the land for payment of the debt. *Id.* § 2, at 5.

*See also* 2 Blackstone, *Commentaries on the Laws of England* **157–58 (Cooley, 4th ed. 1899) (in a conveyance *mortuum vadium*, "the land ... is by law, in case of non-payment at the time limited, forever dead and gone from the mortgagor"); 2 Fonblanque, *A Treatise of Equity* **254–55 (Laussat, 3d ed. 1831); 2 Story, *Commentaries on Equity Jurisprudence* § 1004.

the gage was determined in the English law courts. "[T]he mortgagor was subjected to great hardships and inconveniences if he did not strictly fulfill the conditions of the mortgage at the very time specified; as he thereby forfeited the inheritance or the term ... however great might be its intrinsic value compared with the debt for which it was mortgaged." 2 Story, *Commentaries on Equity Jurisprudence* § 1012.

Consequently, the rights which had originated in an *actio hypothecaria* were developed by the English High Court of Chancery into the doctrines of the mortgagor's equity of redemption and the equitable power of foreclosure. *See id.* § 1013. The equitable doctrines established by the English High Court of Chancery were consistent with the *hypotheca* in Roman civil law: the mortgage was held to be a "mere security for the debt due to the mortgagee"; the mortgagee held the estate as a trust for the mortgagor; and the mortgagor had an "equity of redemption, which he might enforce against the mortgagee, as he could any other trust, if he applied within a reasonable time to redeem, and offered a full payment of the debt and of all equitable charges." *Id.*

The English law courts had also developed strict, technical rules concerning the form of mortgages. The English High Court of Chancery responded by enforcing *any* conveyance as an "equitable mortgage," between the parties, so long as it was the *intention* of the parties that the conveyance in question provide security for a debt. *See* 4 Kent, *Commentaries on American Law* \*\*142–44.

As to what constitutes a mortgage there is no difficulty whatever in Courts of Equity, although there may be technical embarrassments in Courts of Law. *The particular form or words of the conveyance are unimportant;* and it may be laid down as a general rule subject to few exceptions that *wherever a conveyance, assignment, or other instrument, transferring an estate, is originally intended between the parties as a security for money or for any other incumbrance, whether this intention appear from the same instrument or from any other, it is always considered in equity as a mortgage* and consequently is re-

deemable upon the performance of the conditions or stipulations thereof.

2 Story, *Commentaries on Equity Jurisprudence* § 1018 (emphasis added) (footnotes omitted).

Thus, irrespective of form, a conveyance intended as a mortgage has been regarded as enforceable between the parties as an equitable mortgage, thereby preserving the mortgagor's equity of redemption. *Hall v. Livingston,* Del.Ch., 3 Del.Ch. 348, 374–76 (1869). *See also* 2 Fonblanque, *A Treatise of Equity* \*263 n. (h) (Laussat, 3d ed. 1831). Some examples of equitable mortgages that have been recognized originally by the English High Court of Chancery and subsequently by American courts of equity are (1) deposits with a creditor of title deeds intended as security; (2) a deed absolute on its face intended as security; (3) equitable lien of a vendor of real property for unpaid purchase money; and (4) documents defective on their face as mortgages at law but otherwise evincing an intent to establish security for a debt. *See* 2 Story, *Commentaries on Equity Jurisprudence* § 1020; 4 Kent, *Commentaries on American Law* \*\*150–54; 9 Thompson, *Commentaries on the Modern Law of Real Property* § 4669; 1 Glenn, *Mortgages, Deeds of Trust, and Other Security Devices as to Land* §§ 9–18.1 (1943).

### Equitable Foreclosure in Delaware

Equitable foreclosure under Delaware law is premised upon the doctrines established by the English High Court of Chancery. *Fox v. Wharton,* 5 Del.Ch. at 213–14, 218; 2 Woolley, *Practice in Civil Actions in Delaware* § 1355 (1906). *Compare* 3 Blackstone, *Commentaries on the Laws of England* \*\*434–36 (Cooley, 4th ed. 1899); 2 Story, *Commentaries on Equity Jurisprudence* §§ 1018, 1020, 1024–1025; 4 Kent, *Commentaries on American Law* \*\*135–196. "The Colonial Act of Delaware, for the establishment of courts, vested in the courts of equity established thereby, jurisdiction of all matters and causes of equity, according to the practice of the High Court of Chancery of Great Britain." 2 Woolley, *Practice in Civil Actions in Delaware* § 1355 (footnotes and internal quotations omitted). The High

Court of Chancery of Great Britain had power to foreclose a mortgage by a bill in equity. *Monroe Park v. Metropolitan Life Ins. Co.*, Del.Supr., 457 A.2d 734, 735 n. 3 (1983). Thus, the power conferred upon the court of equity by the Colonial Act for the establishment of courts included the power to foreclose mortgages. *Id.* This power was not withheld by reason of the existence of a prior act providing for the enforcement of mortgages by *scire facias. See id.; Fox v. Wharton*, 5 Del.Ch. at 227–28.

On September 20, 1776, Delaware adopted its first Constitution. Although Delaware was adamant in its desire to be independent of England, its first Constitution expressly provided for a preservation of the legal system which had developed in England even prior to the Magna Charta.[5] Article 25 of the Delaware Constitution of 1776 stated:

> The common law of England, as well as so much of the statute law as have been heretofore adopted in practice in this state, shall remain in force, unless they shall be altered by a future law of the Legislature; such parts only excepted as are repugnant to the rights and privileges contained in this constitution and the declaration of rights, & c. agreed to by this convention.

Del. Const. of 1776, art. 25 (emphasis added). Consequently, the broad equitable powers of the High Court of Chancery of Great Britain, which had been vested in Delaware's courts of equity by the Colonial Act, were explicitly perpetuated by the Delaware Constitution of 1776.

Those same equitable powers were conferred upon the Court of Chancery by the Delaware Constitution of 1792. Article VI, Section 14 provided: "The equity jurisdiction heretofore exercised by the Judges of the Court of Common Pleas, shall be separated from the common law jurisdiction, and vested in a Chancellor, who shall hold Courts of Chancery in the several counties of this state." Del. Const. of 1792, art. VI, § 14. *See* Quillen, *Equity Jurisdiction in Delaware Before 1792*, 2 Del. Lawyer 18 (Spring 1984). Those broad equitable powers have not been *abrogated* by any succeeding Delaware Constitution. *Fox v. Wharton*, 5 Del.Ch. at 218–

19; 2 Woolley, *Practice in Civil Actions in Delaware* § 1355.

In Delaware, in addition to the "right of a mortgagee to foreclose a mortgage by bill in equity, there is given to him the additional remedy of enforcing the mortgage by *scire facias* in a law court." 2 Woolley, *Practice in Civil Actions in Delaware* § 1356 (footnote omitted). Between 1726 and 1736, the Colonial authority of Delaware enacted a statute providing for a writ of *scire facias sur mortgage.* 1 *Del.Laws* ch. 46, § 5 (current version codified at 10 *Del.C.* § 5061); *Fox v. Wharton*, 5 Del.Ch. at 215–17. This statute did not divest the Court of Chancery of its historic jurisdiction to foreclose on mortgages. *Fox v. Wharton*, 5 Del.Ch. at 218–19. On the contrary, the right to make a judicial decree of foreclosure is inherent in a court of equity, and "results from the nature of a mortgage, two essential and necessary characteristics of which are the power to redeem, and the power, judicially, to foreclose." *Id.* at 219.

■ Accordingly, the history of Delaware's jurisprudence reflects that concurrent jurisdiction in the Court of Chancery over the foreclosure of mortgages has persisted, without interruption or limitation, under the constitutional and statutory law of this State. *See* Del. Const. art. IV, § 10. *See also* 10 *Del.C.* § 371. This Court has consistently recognized that a mortgagee may elect to have a mortgage, which has been executed with the requisite legal formalities, foreclosed either at law by a writ of *scire facias sur mortgage* in Superior Court, pursuant to 10 *Del.C.* § 5061, or by a bill in equity filed in the Court of Chancery, pursuant to 10 *Del.C.* § 371. *Monroe Park v. Metropolitan Life Ins. Co.*, 457 A.2d at 735. *See also Stidham v. Brooks*, Del.Supr., 5 A.2d 522, 526 (1939); 2 Woolley, *Practice in Civil Actions in Delaware* §§ 1355–1356.

■ A mortgagee's right to foreclose a mortgage by a bill in equity is not often used. 2 Woolley, *Practice in Civil Actions in Delaware* § 1356. However, notwithstanding the generally concurrent jurisdiction previously

---

5. The first document found in the Delaware Code to this day is the Magna Charta. Vol. 1 *Del.C.* 1.

described, foreclosure of an equitable mortgage is vested exclusively within the jurisdiction of the Court of Chancery. *Monroe Park v. Metropolitan Life Ins. Co.*, 457 A.2d at 736. Therefore, CoreStates properly commenced the action to foreclose upon its unsealed mortgage in the Court of Chancery. *See id.*

### Recording Statute
### Equitable Mortgages

The priority of mortgages in Delaware is governed by statute. 25 *Del.C.* § 2106. Section 2106 provides:

> . A mortgage, or a conveyance in the nature of a mortgage, of lands or tenements shall have priority according to the time of recording it in the proper office, without respect to the time of its being sealed and delivered, and shall be a lien from the time of recording it and not before.

*Id.* Handler contends that because the CoreStates mortgage was not executed under seal, it did not satisfy the statutory requirements for a "sufficient" form of mortgage under Delaware law. *See id.* § 2101(a). Therefore, according to Handler, the Core-States mortgage did not constitute a "mortgage" or a "conveyance in the nature of a mortgage" for the purposes of Section 2106. Consequently, Handler argues for the priority of its mortgage under Section 2106, as the first recorded "valid" mortgage.

■ Handler's argument is inconsistent with the undisputed historical fact that there are *two* types of mortgages, legal and equitable. "A mortgage is a conveyance of an estate, by way of pledge for the security of debt, and to become void on payment of it." 4 Kent, *Commentaries on American Law* *135. *See Fox v. Wharton*, 5 Del.Ch. at 226. The *sine qua non* of a "mortgage" is not the form of the document but the intention of the parties to secure a debt with a pledge of real property. *Hall v. Livingston*, 3 Del.Ch. at

374. The form of mortgage, either legal or equitable, is only determinative of the court in which the document may be enforced. *Monroe Park v. Metropolitan Life Ins. Co.*, 457 A.2d at 736.

■ In fact, the Delaware "form of mortgage" statute explicitly states that documents not conforming with its prescribed pattern may nevertheless be valid and fully effectual. 25 *Del.C.* § 2101(c).[6] In *Monroe Park* this Court expressly recognized the Court of Chancery's "equitable power to disregard defects in the execution of a mortgage," pursuant to the principles that (1) "equity regards substance rather than form," and that (2) "equity regards that as done which in good conscience ought to be done." *Monroe Park v. Metropolitan Life Ins. Co.*, 457 A.2d at 737. Consequently, although the absence of a seal on the CoreStates mortgage is a technical defect that precludes the enforcement of the document as a mortgage at law in the Superior Court, it does not affect either the validity of the document as an equitable mortgage or its enforceability in the Court of Chancery. *Id.* at 736.

■ The Delaware statute establishes the priority of *mortgages* according to the time of recording and without regard to their form, i.e., legal or equitable. 25 *Del.C.* § 2106. As the Missouri Supreme Court has held, "[a] mortgage may be irregular where the seal is omitted, or not in accordance with law, but it will nevertheless be valid to create a lien, a trust for the benefit of the creditor, which can be enforced in equity." *Dunn v. Raley*, 58 Mo. 134, 135 (1874). In this case, the Court of Chancery properly found that the CoreStates equitable mortgage was a valid lien on Hitchens Farm and entitled to priority under Section 2106, according to the time of its recording, to the same extent as a mortgage under seal.

---

**6.** It is true that some substantive defects may render a document entirely unenforceable as a mortgage (e.g., failure to state any amount of debt, grossly inadequate description of the premises, or lack of acknowledgement). *See generally* 9 Thompson, *Commentaries on the Modern Law of Real Property* §§ 4662, 4664, 4669. *Cf. Wil-*

*mington Sav. Fund Soc'y v. 1025 Assocs.*, 106 B.R. 805, 810 (Bankr.D.Del.1989). The absence of a seal, however, is not in this category. *See Wilmington Sav. Fund Soc'y v. 1025 Assocs.*, 106 B.R. at 810 (citing *Monroe Park v. Metropolitan Life Ins. Co.*, Del.Supr., 457 A.2d 734 (1983)).

*Third Parties*
*Equitable Mortgages*

Handler contends that, even if CoreStates' mortgage had record priority pursuant to Section 2106, the Court of Chancery was powerless to discharge Handler's subsequently recorded legal mortgage. Handler's contention is premised upon the proposition that the Court of Chancery may enforce an unsealed mortgage only between the parties to that equitable agreement. Handler's argument is refuted by the relevant authorities.

In support of its contention that an equitable foreclosure on an unsealed mortgage is only enforceable between the parties and, thus, ineffectual in discharging a subsequently recorded legal mortgage, Handler relies primarily upon a footnote by this Court in *Monroe Park*, citing Professor Thompson's *Commentaries on the Modern Law of Real Property*. See *Monroe Park v. Metropolitan Life Ins. Co.*, 457 A.2d at 736 n. 7 (quoting 9 Thompson, *Commentaries on the Modern Law of Real Property* § 4669). In the quoted portion of his treatise, Professor Thompson states:

> A mortgage executed without a seal, where it is required, is not a legal mortgage. In equity it amounts to a compact for a mortgage, and as such creates no lien as against purchasers from the mortgagor, or as against his creditors, or even against an assignee under a general assignment for the benefit of creditors.

9 Thompson, *Commentaries on the Modern Law of Real Property* § 4669, at 70 (footnotes omitted), *quoted in Monroe Park v. Metropolitan Life Ins. Co.*, 457 A.2d at 736 n. 7. Handler's reliance on this footnote is misplaced.

▪ Before the institution of recording acts, the liens of third parties without actual notice of the prior equitable mortgage were not subject to discharge upon foreclosure of that equitable mortgage. See 1 Story, *Com-*

*mentaries on Equity Jurisprudence* § 395. Even though modern recording acts allow for constructive notice of a prior mortgage to third parties, there are certain kinds of equitable mortgages, such as the deposit of title deeds and the deed absolute intended as a mortgage, that may necessitate a third party's actual notice as a prerequisite to the discharge of a subsequently recorded mortgage. See *id.*[7] Compare *Hall v. Livingston*, 3 Del.Ch. at 382–83, 396–97. In the vast majority of circumstances, however, constructive notice pursuant to a mortgage recording statute is adequate to subordinate subsequently recorded interests in the mortgaged property, because the prior recorded document generally reflects the parties' intentions to create an equitable mortgage. *Conly v. Industrial Trust Co.*, Del.Ch., 29 A.2d 601, 602 (1943). See 25 *Del.C.* § 2106.

▪ The foregoing fundamental rule of equity, long recognized by Delaware courts, is that "a party taking with notice of an equity takes subject to that equity." See Adams, *The Doctrine of Equity* *151 (Ralston, 8th ed. 1890) (footnote and internal quotations omitted). See *Hall v. Livingston*, 3 Del.Ch. at 382–83, 396–97. See also 2 Story, *Commentaries on Equity Jurisprudence* § 1231. Adams explains this principle of equity as follows: "[I]f a person acquiring property has, at the time of acquisition, notice of a prior equity binding the owner in respect of that property, he shall be assumed to have contracted for that only which the owner could honestly transfer, viz., his interest, subject to the equity as it existed at the date of the notice." Adams, *The Doctrine of Equity* *151 (footnote omitted). Absent statutory authority to the contrary, such notice may be either actual or constructive in nature. *Id.* *151 n. 1. Consequently, it is well-established that a third party's actual or constructive notice of an equitable lien is sufficient to render the lien enforceable in

---

7. Story's *Commentaries* describe the consequences in equity of a third party's actual notice of an equitable mortgage as follows:

> [I]f title deeds should be deposited as a security for money (which would operate as an equitable mortgage), and a creditor knowing the facts should subsequently take a mortgage of

the same property, he would be postponed to the equitable mortgage of the prior creditor, and the notice would raise a trust in him to the amount of such equitable mortgage.

1 Story, *Commentaries on Equity Jurisprudence* § 395 (footnote omitted).

relation to that third party. *Hall v. Livingston,* 3 Del.Ch. at 398–99.[8]

■ In fact, in another section of his treatise, Professor Thompson accepts the foregoing principle as settled: a *bona fide* purchaser for value of property subject to an equitable mortgage, *with notice of such mortgage,* takes the property subject to the equitable mortgage. *See* 9 Thompson, *Commentaries of the Modern Law of Real Property* § 4711, at 229. Therefore, the quotation from Professor Thompson's treatise in *Monroe Park* cited by Handler must be read in the context of the myriad forms of equitable mortgages discussed earlier in this decision. For example, a deed absolute on its face, recorded as a deed, is valid and effectual as a mortgage *only* "as between the parties, if it was intended by them to be merely a security for a debt." 4 Kent, *Commentaries on American Law* *142. *See also Hall v. Livingston,* 3 Del.Ch. at 374, 382–83.

■ The distinction between a deed absolute and an unsealed mortgage with respect to third parties is significant: the recordation of a deed absolute provides no constructive notice of its status as security for a debt, whereas the recordation of an otherwise valid mortgage that lacks a seal provides "clear and undoubted" notice of the prior lien interest of the first mortgagee. *See Hall v. Livingston,* 3 Del.Ch. at 396. The United States Supreme Court has stated: "It has been settled, upon fundamental principles of equity jurisprudence, by many precedents of high authority, that when the seal of a party, required to make an instrument valid and effectual at law, has been omitted by accident or mistake, a court of chancery, in order to carry out his intention, will, at the suit of those who are justly and equitably entitled to the benefit of the instrument, *adjudge it to* be as valid as if it had been sealed, and will grant relief accordingly...." *Bernards Township v. Stebbins,* 109 U.S. 341, 349, 3 S.Ct. 252, 258, 27 L.Ed. 956 (1883) (emphasis added).[9]

In this case, the unsealed CoreStates equitable mortgage read, in relevant part, as follows:

> WHEREAS, Mortgagor is justly indebted to Mortgagee, having executed and delivered to Mortgagee a promissory note (the "Note") bearing even date herewith and evidencing Mortgagor's promise to pay Mortgagee the principal sum of Fifteen Million Two Hundred Sixty–Three Thousand Dollars ($15,263,000.00) or so such thereof as shall have been advanced pursuant to a certain Loan Agreement (the "Loan Agreement") of even date between Mortgagor and Mortgagee and remain outstanding (the "Loan"), lawful money of the United States of America, with interest thereon at the rate and times and in the manner and according to the terms and conditions specified in the Note, all of which are hereby incorporated herein by reference; and

> NOW THIS INDENTURE WITNESSETH, that Mortgagor, in consideration of the indebtedness and as security for the payment to Mortgagee of the principal with interest, and all other sums provided for in the Note, the Loan Agreement and in this Mortgage, including, but not limited to, any future advances that may be made by Mortgagee to Mortgagor, (the Note, the Loan Agreement and all other agreements and instruments executed in connection with the Loan being hereinafter collectively referred to herein as the "Loan Documents"), and for performance of the agreements, conditions, covenants, provisions

---

8. *See, e.g.,* Bispham, *Principles of Equity* §§ 353, 356 (McCoy, 10th ed. 1922) (vendor purchase-money equitable liens unenforceable against bona fide purchaser without notice); 2 Story, *Commentaries on Equity Jurisprudence* §§ 1228–1229 (same); 4 Kent, *Commentaries on American Law* **150–51 (deposit of title deeds with creditor creates equitable mortgage, enforceable "against the mortgagor, and all who claim under him, with notice, either actual or constructive, of such deposits having been made").

9. *Accord* Bispham, *Principles of Equity* § 351, at 569 (McCoy, 10th ed. 1922) ("[A]n equitable lien ... is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees and *purchasers or encumbrancers with notice.*") (emphasis added) (quoting Pomeroy, *Equity Jurisprudence* § 1235 and citing *Walker v. Brown,* 165 U.S. 654, 17 S.Ct. 453, 41 L.Ed. 865 (1897)).

and stipulations contained in this Mortgage and the Loan Documents has granted, bargained, sold, released and confirmed, and by these presents does hereby grant, bargain, sell, release and confirm unto Mortgagee that certain tract or parcel of land lying and being in Mill Creek Hundred, County of New Castle, and State of Delaware, as more particularly described and set forth in Exhibit "A" attached hereto and made part hereof (hereinafter the "Land").

The record reflects that Handler had actual and constructive notice of CoreStates' prior equitable mortgage on the Hitchens Farm real property.

*Discharge of Junior Mortgages in Equity*

 Another principle which was well-established in the English common law was that courts of equity should apply the same rules of property as those applied in the courts of law, unless doing so would work injustice. *See* 3 Blackstone, *Commentaries on the Laws of England* \*\*435–36.[10] Section 371 reflects the General Assembly's application of that principle to equitable foreclosures and sales of real property ordered in the Court of Chancery, which may be given the same force and effect as sales pursuant to writs of *scire facias sur mortgage* in Superior Court. *See also Stidham v. Brooks*, 5 A.2d at 526. Accordingly, the Court of Chancery has both the common law and statutory au-

thority to order the sale of real estate with the same effect as a sale ordered by the Superior Court: "Such sales shall be as available in law to the vendees [in the Court of Chancery], as sales of land seized and sold upon judgment and execution are available by virtue of any law of this State." 10 *Del.C.* § 371.

 The recognized purpose of the Delaware recording statute is to afford notice of the document's contents, and of "all rights, title, or interests, *legal or equitable,* created by or embraced within it, to every person subsequently dealing with the subject matter whose interest or duty it is to make a search of the records." *Conly v. Industrial Trust Co.*, Del.Ch., 29 A.2d 601, 602 (1943) (emphasis added) (quoting 2 Pomeroy, *Equity Jurisprudence* § 649 (4th ed.)); *Winchester v. Parm*, Del.Ch., 141 A. 271, 275 (1928). The Delaware statute reflects a legislative judgment that requiring constructive notice by timely recordation in virtually every case, rather than permitting the consideration of a third party's actual notice, promotes the reliability and consistency of the mortgage priority system for real property.[11] *See Conly v. Industrial Trust Co.*, 29 A.2d at 602. *See also* 4 Kent, *Commentaries on American Law* \*169.

 Delaware's mortgage recording statute for "lands or tenements" is a pure race statute. 25 *Del.C.* § 2106. As such, the time

---

**10.** Blackstone's *Commentaries* address the need for uniformity in the context of concurrent jurisdiction in law and equity:

> So in mortgages, being only a landed as the [bond] is a personal security for the money lent, the payment of principal, interest, and costs, ought at any time, before judgment executed, to have saved the forfeiture in a court of law, as well as in a court of equity. And the inconvenience, as well as injustice, of putting different constructions in different courts upon one and the same transaction, obliged the parliament at length to interfere, and to direct, by the statutes ... that, in the cases of bonds and mortgages, what had long been the practice of the courts of equity should also for the future be universally followed in the courts of law; wherein it had before these statutes in some degree obtained a footing.

3 Blackstone, *Commentaries on the Laws of England* \*436 (citations omitted).

**11.** This Court has stated that one situation in which actual notice is relevant to a priority determination under Section 2106 arises when it is impossible to determine who in fact was the first to record. *Guarantee Bank v. Magness Construction Co.*, Del.Supr., 462 A.2d 405, 408 n. 2 (1983) (citing *Winchester v. Parm*, Del.Ch., 141 A. 271 (1928)).

However, in the previous example of the recorded deed absolute on its face but treated as an equitable mortgage only between the parties unless a third party has actual notice of its mortgage status, Section 2106 may be inapplicable. A deed absolute, unlike an unsealed real property security document, is arguably *not* a "mortgage" or a "conveyance in the nature of a mortgage" for the purposes of Section 2106, or, in the alternative, it may present a special case in which actual notice is indeed relevant to determine the priority and dischargeability of subsequently recorded messages. *See Hall v. Livingston*, 3 Del.Ch. at 382–83, 396–97.

of recording is determinative of priority. *Id.;* *First Mortgage Co. v. Federal Leasing Corp.,* Del.Supr., 456 A.2d 794, 795 (1982). In this case, the CoreStates mortgage was recorded in compliance with Section 2106.

■ The record reflects that Handler had both constructive and actual notice of the CoreStates prior mortgage. It should have also known that as a matter of established Delaware law, the CoreStates mortgage was valid and enforceable in equity. *Monroe Park v. Metropolitan Life Ins. Co.,* 457 A.2d at 735–36. In fact, the record reflects that the Court of Chancery noted that the assignors of the mortgage to Handler, Grossi and Vilone, had acknowledged in writing to CoreStates that the CoreStates prior mortgage had priority over their subsequent mortgage.

In an equitable foreclosure action:

The correct form of a decree in a bill [in equity] by a mortgagee is to find the making of the mortgage; *the lien acquired thereby, in case there are other incumbrances or rights;* the amount due thereon, if it be security for a debt; and an order for a sale of the mortgaged property so that from the proceeds of sale the debt may be paid.

*Malsberger v. Parsons,* Del.Ch., 100 A. 786, 787 (1917) (emphasis added).

The record supports the Court of Chancery's determination that CoreStates equitable mortgage was a valid first lien on the Hitchens Farm property. The final form of decree correctly provided for the extinguishment of all liens which were junior to the CoreStates equitable mortgage. Therefore, the Court of Chancery properly discharged Handler's subsequently recorded legal mortgage.

### Conclusion

The final judgment entered by the Court of Chancery is hereby AFFIRMED.