IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KAMAL BATHLA, | § | |
| | § | No. 28, 2018 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | |
| 913 MARKET, LLC, | § | C.A. No. N16C-11-149-JAP |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted:  November 14, 2018
Decided:    December 20, 2018

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court.  **AFFIRMED**.

Jeffrey M. Weiner, Esquire, LAW OFFICES OF JEFFREY M. WEINER, P.A., Wilmington, Delaware, for Appellant, Kamal Bathla.

Charles J. Brown, II, Esquire, GELLERT, SCALI, BUSENKELL & BROWN, LLC, Wilmington, Delaware, for Appellee, 913 Market, LLC.

**STRINE**, Chief Justice, for the Majority:

This appeal concerns a dispute over which party to a failed commercial real estate sale is entitled to the buyer's deposit. The seller, 913 Market, LLC, claims that it is entitled to the deposit because the buyer failed to close the deal on the agreed date, and it brought this action against the buyer claiming breach of contract and seeking a declaratory judgment regarding its rights under the purchase agreement. The buyer, Kamal Bathla, asserts two reasons why the deposit is rightfully his. First, he contends that 913 Market could not convey title free and clear of all liens and encumbrances, as required by the purchase agreement, due to potential claims by a previous potential buyer of the building that had also failed to close. Second, Bathla argues that one of the conditions precedent was not satisfied because the title insurance commitment he received contained an exception, relating to litigation risk from the previous potential buyer, that did not exist in 913 Market's existing title insurance policy. In either case, Bathla maintains, he was relieved of any obligation to close, and therefore has a right to get his money back. Both of Bathla's theories center around the notion that the previous failed buyer, who had bid a higher price than Bathla but then backed out of the deal, might somehow emerge to sue Bathla over the property.

The Superior Court granted summary judgment for 913 Market. In rejecting Bathla's first argument, the court reasoned that potential claims by the previous failed buyer did not cloud title because the previous buyer "had not perfected (nor

did it seek to perfect) a *lis pendens* claim."[1]  In rejecting Bathla's second argument, the court read the purchase agreement as establishing a test based not on "what exceptions the Purchaser's title insurance carrier might insist upon," but rather on "whether Seller was able to convey satisfactory title, which it did."[2]  Bathla appeals this grant of summary judgment.

We affirm the Superior Court's decision.  Contrary to Bathla's exhortations, the mere possibility that a previous potential buyer who failed to close *might* later claim an interest in the building does not constitute a lien or encumbrance under the purchase agreement, and the condition precedent identified by Bathla does not require that he obtain a title commitment with exceptions that mirror those of 913 Market's existing policy.  And ultimately, the basic premise of Bathla's case—that there was a genuine risk that the previous potential buyer would sue Bathla over the property—is implausible and does not provide a basis under the contract to avoid the obligation to close.

## I.

In June 2016, 913 Market auctioned its eponymous commercial real estate property, located in downtown Wilmington.[3]  The highest bidder, InvestUSA, agreed

---

[1] *913 Market, LLC v. Bathla*, C.A. No. N16C-11-149 JAP, slip op. at 4–5 (Del. Super. Ct. Oct. 31, 2017).
[2] *Id.* at 5.
[3] *Id.* at 2.

to pay $1,233,750 with a July 15, 2016 closing, but for unknown reasons, it failed to close the deal.[4] On August 3, 2016, doubting the prospects of a deal with InvestUSA, 913 Market struck an alternative deal to sell the building to Bathla, the second highest bidder, for $1,125,000.[5] The new agreement's recitals disclosed the previous agreement's existence. Specifically, they stated that (1) 913 Market had "previously contracted to sell the" building under an existing contract, which the previous buyer had "failed to timely close"; (2) 913 Market "has agreed to enter into a 'backup' contract with [Bathla] which shall become a primary contract upon termination of" that previous contract; and (3) 913 Market had already terminated the existing contract.[6] Thus, the previous deal with InvestUSA was no surprise to Bathla.

As required by the purchase agreement, Bathla deposited $118,125 with the escrow agent pending the deal's completion.[7] Absent the "wrongful failure" of 913 Market to close the deal, the failure of one of the buyer's conditions precedent, or other circumstances not relevant here, the agreement makes this deposit nonrefundable.[8] The agreement further provides for liquidated damages in an

---

[4] *Id.*; Opening Br. at 20–21; App. to Opening Br. at A-73.
[5] App. to Opening Br. at A-16.
[6] *Id.*
[7] *Id.* at A-17.
[8] *Id.* ("Absent (w) the wrongful failure of Seller to close hereunder, (x) the failure of a condition precedent under Section 4.1 below to be timely satisfied, (y) as otherwise expressively provided in Article 7 below, the Deposit shall not be refundable to Buyer and shall either be paid over to Seller should this Agreement be terminated for any reason or applied on account of the Purchase Price as below provided in subsection (c) of this Section 1.3.").

amount equal to the deposit in the event that Bathla breaches the agreement, instructs the escrow agent to release the deposit to 913 Market upon Bathla's default,[9] and contains "time is of the essence"[10] and integration[11] clauses. The parties selected September 19, 2016 as the closing date.[12]

Two provisions are plausibly relevant to Bathla's obligation to close. First, Section 2.3 of the agreement requires 913 Market to convey title "free and clear of all liens and encumbrances other than real and personal property taxes not yet due and payable and the Permitted Exceptions (hereinafter defined)."[13] A failure by 913 Market to convey title free and clear would constitute a "wrongful failure" to close, entitling Bathla to get his deposit back.[14] Second, Section 4.1(a) sets forth a condition precedent that "[t]itle to the Property shall be subject only to the same exceptions as shown on Seller's title policy with the exception that the mortgage lien thereon shall be satisfied at Closing from the proceeds of sale."[15] If the building's

---

[9] *Id.* at A-24 ("DAMAGES SHALL BE IN AN AMOUNT EQUAL TO THE AMOUNT OF THE DEPOSIT . . . AND . . . ESCROW HOLDER IS HEREBY IRREVOCABLY INSTRUCTED TO DELIVER SUCH DEPOSIT TO SELLER BY ESCROW HOLDER UPON SUCH DEFAULT BY BUYER, AND THEREAFTER RETAINED BY SELLER AS LIQUIDATED DAMAGES.").

[10] *Id.* at A-31 ("Time is of the essence of this Agreement, it being understood that each date set forth herein and the obligations of the parties to be satisfied by such date have been the subject of specific negotiation by the parties.").

[11] *Id.* at A-30–A-31 ("This Agreement and the items incorporated herein contain all the agreements of the parties hereto with respect to the matters contained herein; and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.").

[12] *Id.* at A-18.

[13] *Id.*

[14] *See id.* at A-17 (providing that the deposit "shall not be refundable to Buyer" absent "the wrongful failure of Seller to close" or certain other circumstances).

[15] *Id.* at A-21.

4

title were subject to an additional exception that did not appear in 913 Market's existing policy, then this "failure of a condition precedent" would also entitle Bathla to a refund of his deposit.[16]

In the days before closing, things soured. On September 15, 2016, Bathla's title insurer, First American Title Insurance Company, issued him a title commitment containing an exception for any loss or damage resulting from any of InvestUSA's "rights, title and interest to the subject property" under its July 15, 2016 contract with 913 Market.[17] Then, the day before the scheduled closing, Bathla's counsel sent a letter to 913 Market claiming that the InvestUSA exception indicates that the Section 4.1(a) condition precedent would not be satisfied because "the title policy [Bathla] would be receiving is now subject to a new exception" that did not appear in 913 Market's own title policy.[18] The next day, 913 Market's counsel informed Bathla that it interpreted the Section 4.1(a) condition precedent as relating to "the condition of the title of record," not Bathla's "proposed title policy," and that Bathla's failure to close that day would constitute a default and allow 913 Market to demand the deposit and terminate the agreement.[19]

---

[16] *See id.* at A-17 (providing that the deposit "shall not be refundable to Buyer" absent "the failure of a condition precedent under Section 4.1 below to be timely satisfied" or certain other circumstances).

[17] *Id.* at A-130; Opening Br. at 28.

[18] App. to Opening Br. at A-134.

[19] *Id.* at A-135.

5

After Bathla failed to close, 913 Market brought this action in the Superior Court claiming breach of contract and seeking $118,125 in damages and a declaratory judgment regarding its rights under the purchase agreement.[20] The Superior Court denied both Bathla's motion to dismiss[21] and later motion for reargument.[22]

After discovery,[23] both parties moved for summary judgment, which the Superior Court granted for 913 Market and denied to Bathla.[24] In its summary judgment opinion, the court rejected Bathla's charge that the possibility of InvestUSA later claiming an interest in the property made title unmarketable "because InvestUSA had not perfected (nor did it seek to perfect) a *lis pendens* claim."[25] The court also rejected Bathla's conditions precedent argument, ruling that the purchase agreement establishes a test based not on "what exceptions the

---

[20] App. to Opening Br. at A-12–A-14.

[21] *913 Market, LLC v. Bathla*, 2017 WL 1507539, at *3 (Del. Super. Ct. Apr. 26, 2017).

[22] *913 Market, LLC v. Bathla*, C.A. No. N16C-11-149 JAP, slip op. at 7 (Del. Super. Ct. May 10, 2017).

[23] In its summary judgment opinion, the Superior Court noted that Bathla had argued that 913 Market's "motion for summary judgment was premature because discovery has not yet been completed." *913 Market, LLC v. Bathla*, C.A. No. N16C-11-149 JAP, slip op. at 6 (Del. Super. Ct. Oct. 31, 2017). The Superior Court denied this request to delay summary judgment because (1) Bathla had not filed an affidavit explaining his need for additional discovery, as required by Civil Rule 56; (2) Bathla's response to 913 Market's motion for summary judgment did not "explain precisely what discovery he needs"; and (3) "in light of the court's conclusion that the terms of the sales agreement are unambiguous, any extrinsic evidence divulged by further discovery would likely be inadmissible." *Id.* at 6–7. Bathla does not challenge this ruling on appeal. *See* Opening Br.; Reply Br.

[24] *913 Market, LLC v. Bathla*, C.A. No. N16C-11-149 JAP, slip op. at 1 (Del. Super. Ct. Oct. 31, 2017).

[25] *Id.* at 4–5.

6

Purchaser's title insurance carrier might insist upon," but rather on "whether Seller was able to convey satisfactory title, which it did."[26]  An implementing final judgment followed, from which Bathla timely appealed.

## II.

This Court reviews the Superior Court's grant of summary judgment, including questions of contract interpretation, *de novo*.[27]  In doing so, the Court must "determine whether, viewing the facts in the light most favorable to the nonmoving party, the moving party has demonstrated that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law."[28]

In interpreting a contract, the Court must "give priority to the parties' intentions as reflected in the four corners of the agreement."[29]  The Court must "interpret clear and unambiguous terms according to their ordinary meaning,"[30] and in an "unambiguous, integrated written contract," the Court may not use extrinsic evidence to "vary[] or contradict[] the terms of that contract."[31]  The test for ambiguity is whether "the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings."[32]  Thus, "[a]

---

[26] *Id.* at 5.
[27] *See GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012).
[28] *Estate of Rae v. Murphy*, 956 A.2d 1266, 1269–70 (Del. 2008) (quoting *Green v. Weiner*, 766 A.2d 492, 494 (Del.2001)) (internal quotation marks omitted).
[29] *GMG Capital*, 36 A.3d at 779.
[30] *Id.* at 780.
[31] *Galatino v. Baffone*, 46 A.3d 1076, 1081 (Del. 2012).
[32] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."[33]

Bathla's arguments on appeal center around the notion that he was excused from closing because of potential litigation risk from InvestUSA, the previous potential buyer that backed out. He bases this theory on two different provisions in the purchase agreement: Section 2.3, which requires 913 Market to convey good title; and Section 4.1(a), which sets a title-related condition precedent to Bathla's obligation to close.[34] At bottom, Bathla claims he can avoid his contractual obligations because a party who had itself failed to close after signing an agreement to buy the property might reemerge and claim title.

First, Bathla argues that he was not required to close because 913 Market breached Section 2.3 by failing to convey title "free and clear of all liens and encumbrances other than real and personal property taxes not yet due and payable and the permitted exceptions [*sic*]."[35] Although his briefing is confusing on this

---

[33] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[34] Bathla has not always been clear about which of these two provisions he is relying on. At times, he seems to suggest that he is only making a conditions precedent argument. *See, e.g.*, Hearing Transcript, App. to Opening Br. at A-573 (Bathla's counsel stating "[t]his is not a title question" and referring solely to the conditions precedent provision). At other times, he seems to argue that 913 Market breached the title conveyance provision, which would be a distinct basis for avoiding his closing obligations. *See, e.g.*, Reply Br. at 2, 6–11 (citing the title conveyance provisions of the contract, claiming that "[t]he Superior Court erred by holding that there could be no cloud on the title," and collecting citations as to the definition of "marketable title"). We address both claims because, in any event, Bathla is not entitled to relief under either provision.

[35] Opening Br. at 18 (emphasis omitted).

8

point, Bathla seems to view the phrase "Permitted Exceptions" as expanding the range of title defects to include any exception contained in his own title commitment that was not "permitted" under the purchase agreement, with the term "Permitted Exception" including only those exceptions that appeared in 913 Market's title policy.[36]  Under this theory, the InvestUSA litigation risk is a title defect simply because it was not in 913 Market's title policy.  And in any event, Bathla charges, the specter of a potential claim by InvestUSA "in and of itself rendered title unmarketable."[37]  Here, Bathla relies on a general theory that the threat of litigation creates a cloud on title that, irrespective of the "Permitted Exception" language, allows the buyer to back out.

Second, Bathla argues that his obligations were excused by a failure in the condition precedent in Section 4.1(a) that "[t]itle to the Property shall be subject only to the same exceptions as shown on Seller's title policy."  Specifically, he claims that his title insurer's "insertion of Exception 17 [relating to InvestUSA] into its title commitment made it objectively impossible for title to the property to be subject to the same exceptions as shown in 913 Market's title commitment," so "title to the Property could not 'be subject only to the same exceptions as shown on Seller's title policy (commitment).'"[38]

---

[36] *See id.* at 19–24.
[37] Reply Br. at 10.
[38] *Id.* at 2–4; *see also* Opening Br. at 24–30.

Neither of these arguments has a viable basis in the contract. As to Bathla's first argument, Section 2.3 does not support Bathla's capacious understanding of what constitutes a title defect. To the extent that Bathla interprets the "Permitted Exceptions" language to expand the range of title defects, he misunderstands this provision. Section 2.3 requires 913 Market to convey title "free and clear of all liens and encumbrances *other* than real and personal property taxes not yet due and payable and the Permitted Exceptions (hereinafter defined)."[39] In other words, 913 Market must convey title without any liens or encumbrances on the property, *except* for certain liens and encumbrances that the parties have decided are acceptable: (1) property taxes that are not yet due and (2) "Permitted Exceptions" that the parties have enumerated. Thus, the "Permitted Exceptions" language *limits*, not *expands*, the range of issues that cloud the property's title. Bathla's reading flips this construct on its head.

As for the notion that litigation risk related to InvestUSA "in and of itself rendered title unmarketable," the mere possibility that InvestUSA might later claim an interest in the building does not constitute a "lien" or "encumbrance" under Section 2.3. To be sure, 913 Market did indicate it might sue InvestUSA for its failure to close to recover its deposit. Of course, that theory does not suggest that

---

[39] App. to Opening Br. at A-18 (emphasis added). In an apparent drafting error, the contract does not define the term "Permitted Exceptions."

10

InvestUSA could claim any right in the 913 Market property. It suggests the opposite: that InvestUSA had walked away and refused to buy the property, despite a possible contractual obligation to do so. But in any event, under Delaware's "pure race statute," any potential claim that InvestUSA might have on the property would have been extinguished had Bathla closed and recorded his deed.[40] It is irrelevant that Bathla had notice of the prior InvestUSA contract.[41] The fact that there was

---

[40] *See Eastern Savings Bank, FSB v. Cach, LLC*, 124 A.3d 585, 497 (Del. 2015) (Seitz, J., dissenting) ("Delaware has a 'pure race recording statute.' The statute provides that '[a] deed concerning lands or tenements shall have priority from the time it is recorded in the proper office . . . .'" (citing 25 *Del. C.* § 153)); *N&W Dev. Co. v. Carey*, 1983 WL 17997, at *3 (Del. Ch. Jan. 27, 1983), *aff'd*, 474 A.2d 138 (Del. 1983) (TABLE) ("The statute . . . is a 'pure race to the recorder's office' statute, that is, the first to file a valid deed gains priority in title."); *Mehaffey v. Raley*, 2002 WL 31112196, at *3 (Del. Ch. Aug. 29, 2002) ("Delaware is . . . a 'pure race to the recorder's office' state which gives priority in title to the first grantee to file a valid deed . . . ." (internal quotation marks omitted); *In re Unclaimed Proceeds from the Execution of Sale by the Sheriff of Kent Cty.*, 2013 WL 3482206, at *2 (Del. Super. Ct. July 3, 2013) ("Delaware has a pure race recording statute, meaning that priority is granted to the promisee who first records his interest."); *cf. First Mortg. Co. of Pa. v. Fed. Leasing Corp.*, 456 A.2d 794, 795 (Del. 1982) ("§ 2106 is a pure race statute and as such the time of recording is determinative. The rule is first in time, first in right. In the instant case Federal recorded its mortgages in September, 1976, a full six months before FMCP, and, therefore, had priority."); *Guarantee Bank v. Magness Constr. Co.*, 462 A.2d 405 (1983) (citing *Federal Leasing* for the same proposition); *Handler Constr., Inc. v. CoreStates Bank, N.A.*, 633 A.2d 356, 366–67 (Del. 1993) ("Delaware's mortgage recording statute for 'lands or tenements' is a pure race statute. As such, the time of recording is determinative of priority." (internal citations omitted)); *Eastern Savings Bank*, 124 A.3d at 589 ("Section 2106 is a pure race statute, providing that the time of recording is determinative of the priority of competing creditors. The rule is first in time, first in right." (internal citations and quotation marks omitted)).

[41] *See Carey*, 1983 WL 17997, at *1 (reasoning that the defendant's "arguments concerning the plaintiff's prior notice of his claims of title and the plaintiff's arguments about its status as a bona fide purchaser . . . need not be considered" because the defendant "lost the race to the to the recorder's office," and "questions of notice" are "irrelevant" under "a pure race statute"); *Mehaffey*, 2002 WL 31112196, at *3 ("Delaware is . . . a 'pure race to the recorder's office' state . . . . As a consequence, 'as between two grantees, both of whom gave a valuable consideration, a subsequent purchaser possessing knowledge of an unrecorded interest in the property would still take a superior interest in the property if he recorded his deed first.'" (quoting *Carey*, 1983 WL 17997, at *3); THOMAS W. MERRILL & HENRY E. SMITH, PROPERTY: PRINCIPLES AND POLICIES 921

11

eventually a lawsuit between 913 Market and InvestUSA is also irrelevant; 913

Market filed its lawsuit against InvestUSA *after* the scheduled closing with Bathla.[42]

Turning to Bathla's second argument, Bathla incorrectly interprets the condition precedent language in Section 4.1(a) as qualifying his closing obligations based on the exceptions contained in his title insurance policy or commitment. Section 4.1(a) provides that "[t]itle to the Property shall be subject only to the same exceptions as shown on Seller's title policy with the exception that the mortgage lien thereon shall be satisfied at Closing from the proceeds of the sale."[43]  By requiring

---

(2d ed. 2012) ("Race statutes create an exception to the *nemo dat* principle [*i.e.*, "one cannot give that which one does not have"] and a partial exception to the good faith purchaser doctrine, insofar as the first party to record wins even if she has actual notice of a prior conveyance."); 14 POWELL ON REAL PROPERTY § 82.02[1][c][i], LexisNexis (Michael Allan Wolf ed., 2015) ("Any notice received . . . concerning the prior interest is irrelevant."); *cf. Gaurantee Bank*, 462 A.2d at 407–08 (holding that the prior mortgage holder's notice-based argument "misconstrues the Delaware statute governing priority of mortgages" and that "the fact that [the subsequent mortgage holder] had notice of a potential mortgage is irrelevant").  *See also Dep't of Transp. v. Humphries*, 496 S.E.2d 563, 567 (N.C. 1998) ("[A] 'pure race' statute protects any purchaser for value who records first, regardless of notice."); *Blevins v. Barker*, 75 N.C. 436, 438 (N.C. 1876) ("No such encumbrance, by whatever name called, can be created so as to operate against creditors, and subsequent purchasers for value, until registered. . . .  [N]o notice to the purchaser . . . , however full and formal, will supply the place of registration . . . ."); *McDuffie v. Walker*, 51 So. 100, 102–05 (La. 1909) (holding that, under Louisiana's race statute, a subsequent purchaser who records first has priority even with actual knowledge of a prior purchase); *Soniat v. Whitmer*, 74 So. 916, 917 (La. 1916) ("[B]y the decision in [*McDuffie*], and many subsequent decisions, the once vexatious question of whether the purchaser of real estate can be affected by unrecorded claims against the property, even though at the time of the purchase he had actual knowledge of them, has been settled in the negative—let us hope forever.").
[42] Compl., *913 Market, LLC v. Investusa Holding Enterprises, LLC*, C.A. No. N16C-09-240 CLS (Del. Super. Ct. June 12, 2018) (listing a September 27, 2016 filing date).  Because there was no pending lawsuit at the time of the scheduled closing, we need not consider whether it is necessary for a claimant to follow the procedures set forth in Delaware's *lis pendens* statute, 25 *Del. C.* §§ 1601 *et seq.*, when there is actual notice of a pending lawsuit.
[43] App. to Opening Br. at A-21.

that *title* "be subject only to" those exceptions that appeared in 913 Market's title policy, this provision does not condition Bathla's closing obligations on whatever exceptions happen to be present in the title commitment that he obtains. To be sure, a real estate purchase agreement may condition the buyer's closing obligations on obtaining satisfactory title insurance.[44] But this provision does not refer to Bathla's title insurance. Instead, it simply refers to "[t]itle to the Property." This exclusive reference to the property's title, and not Bathla's title insurance, ensures that Bathla can get out of the deal if the property's *actual* title, viewed objectively, is subject to new exceptions that did not appear in 913 Market's policy.[45] Bathla's preferred interpretation, by contrast, would allow him to shirk his closing obligations without making a genuine effort to get his title insurance from another company.[46]

When viewed objectively, there was no exception to the property's title that would excuse Bathla from closing under Section 4.1(a). As discussed above, the supposed "hazard of litigation" that Bathla identifies could not affect Bathla's title

---

[44] *See, e.g.*, 1 ALVIN ARNOLD & MYRON KOVE, MODERN REAL ESTATE PRACTICE FORMS § 19:3, Westlaw (last updated Nov. 2017) ("Seller shall convey to Buyer a good and marketable title and such as will be insured by a reputable title company at regular rates . . . .").

[45] *See* BLACK'S LAW DICTIONARY, Westlaw (10th ed. 2014) (defining "title" as "[t]he union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property; the legal link between a person who owns property and the property itself," or, alternatively, "[l]egal evidence of a person's ownership rights in property; an instrument (such as a deed) that constitutes such evidence"); 63C AMERICAN JURISPRUDENCE 2D PROPERTY § 28, Westlaw (last updated Sept. 2018) ("'Title' means the right to, or ownership in, a thing.").

[46] The contract does not impose a "best efforts" or "commercially reasonable efforts" requirement on Bathla to obtain title insurance.

13

to the property. As a matter of law, had Bathla closed and recorded his deed, this would have foreclosed any claim by InvestUSA under Delaware's pure race statute. As a matter of reality, Bathla's theory makes no commercial sense. His theory rests on the notion that there was a plausible chance that InvestUSA, which had bid a higher price than Bathla but then backed out of the deal and failed to close, could and would sue Bathla if he closed and contend that it had a right to the property. On what basis? InvestUSA did not want the property; it backed *out* of the deal. Nothing changed between Bathla signing the contract and the scheduled closing, other than Bathla deciding that he did not want to close.

The provisions of the contract between Bathla and 913 Market that explicitly refer to the prior contract that went South underscore just how strained it is for Bathla to try to use the InvestUSA deal as an excuse not to close. If, as Bathla contends, the mere prospect for a dispute between 913 Market and InvestUSA was enough to justify his own failure to close, there were contractual tools to address that easily. Bathla knew or should have known, from the recitals in the contract he signed, that he was paying less than InvestUSA had promised, and he should have assumed that 913 Market might wish to recover the difference from InvestUSA for its failure to buy as it allegedly promised. If Bathla had wanted to close only if there was no dispute between InvestUSA and 913 Market, he could have insisted on making the absence of litigation between them or the receipt of a waiver from InvestUSA a

14

closing condition, or he could have insisted on an indemnification right. Bathla did not do so, and he has failed to articulate a rational interpretation of Section 2.3 or Section 4.1(a) that acts as a substitute for straightforward protections of that kind.

### III.

The Superior Court correctly concluded that 913 Market did not breach its obligation to convey title free and clear, and that the condition precedent related to the property's title was satisfied. As a result, Bathla's failure to timely close constituted a breach of the purchase agreement, and 913 Market is entitled to the buyer's deposit. The Superior Court was therefore correct in granting summary judgment for 913 Market, and we affirm its implementing final order.

**VAUGHN**, Justice, dissenting:

The Superior Court granted summary judgment on a theory that InvestUSA had not perfected a claim on title by filing a notice of pendency. As the Superior Court put it, "there was no cloud on title because of a potential claim from InvestUSA because InvestUSA had not perfected (nor did it seek to perfect) a *lis pendens* lien."[1] On this reasoning, the fact that First American Title Insurance Company proposed to include an exception for the InvestUSA contract in Mr. Bathla's owner's title insurance policy did not defeat 913 Market's ability to deliver good title because the InvestUSA contract was never a cloud on title.

I think the Superior Court erred by allowing its decision to be influenced by the doctrine of *lis pendens*. The law of *lis pendens* establishes a method by which a party asserting a claim on title to real property in a pending civil action may give constructive notice of that claim to persons acquiring an interest in the property.[2] Where a party has actual notice of the claim from an independent source, however, the giving or lack of giving of constructive notice through the filing or non-filing of a notice of pendency is irrelevant. Notice is notice, whether it is actual or constructive. In this case, Bathla had actual notice of InvestUSA's contract when he signed his contract. Since Bathla had actual notice of the InvestUSA contract,

---

[1] *913 Market, LLC v. Bathla*, C.A. No. N16C-11-149 JAP, slip op. at 4-5 (Del. Super. Oct. 31, 2017).
[2] *See* 25 *Del. C.* §§ 1601, 1603.

the filing of a notice of pendency would be superfluous, and the non-filing of a notice of pendency has no bearing on the rights and liabilities of the parties.

The majority's decision is that the mere possibility that InvestUSA might assert a claim against the property does not constitute an encumbrance, and, in any event, Delaware's race recording statute would have extinguished any such claim if Bathla had simply gone to settlement and recorded his deed.

I think the principle that should govern this case is that one who takes title to property with notice of an equity takes subject to that equity. An early case discussing this principle is *Cieniewicz v. Sliwka*.[3] In that case, Mr. and Mrs. Sliwka owned real property, and they entered into an agreement to sell that property to Mr. and Mrs. Cieniewicz.[4] The Sliwkas, however, then conveyed the premises by deed to a couple named Kopanski, who in turn conveyed the premises to a couple named Boc.[5] The Cieniewiczs filed an action for specific performance against the Sliwkas and the Bocs, seeking to have the Bocs honor the Cieniewiczs' contract with the Sliwkas.[6] The Chancellor reasoned that in order for the Bocs to defend successfully against the Cieniewiczs' claim, the burden was on the Bocs to establish that either they or the Kopanskis were bona fide purchasers for valuable consideration without

---

[3] 133 A. 695 (Del. Ch. 1926).
[4] *Id.* at 695.
[5] *Id.*
[6] *Id.*

2

notice of the Cieniewiczs' claim.[7]  The Chancellor concluded on the facts that both the Kopanskis and the Bocs were bona fide purchasers for value without notice of the Cieniewiczs' claim.[8]  The Cieniewiczs' claim for specific performance was therefore denied.[9]

Another example of a case applying this principle is *Marsh v. Marsh*.[10]  In that case, Franklin and Theresa Marsh entered into an agreement of sale with Double 'S' Construction Co. to purchase a dwelling to be erected on a lot.[11]  While the house was under construction, Franklin and Theresa separated.[12]  Upon completion of the house, Double 'S' wished to proceed with settlement.[13]  Franklin told Double 'S' that he and Theresa were getting a divorce, but that his son Wayne, and his wife Mary, would proceed with settlement.[14]  Without notice to Theresa, Wayne and Mary completed settlement, and the property was deeded to them.[15]  Franklin paid part of the purchase price from his funds, and the balance was paid through a mortgage.[16]  Franklin, Wayne and Mary agreed that they would jointly occupy the

---

[7] *Id.*
[8] *Id.* at 695-96.
[9] *Id.* at 696.
[10] 261 A.2d 540 (Del. Ch. 1970).
[11] *Id.* at 541.
[12] *Id.*
[13] *Id.*
[14] *Id.* at 541-42.
[15] *Id.* at 542.
[16] *Id.*

house and Franklin would bear all costs including the mortgage payments.[17] After settlement, however, Franklin and Theresa reconciled temporarily and moved into the property. The Court of Chancery, citing *Cieniewicz*, found that Theresa had an equitable interest in the property as a vendee in the agreement of sale with Double 'S' and that Wayne and Mary had notice of that interest. Applying the principle that one taking title to property with notice of an outstanding equity takes subject to that equity, the court impressed an equitable lien in Theresa's favor on the property for one half of the amount of that portion of the purchase price which Franklin had paid from his funds.[18]

*Cieniewicz* predates our pure race recording statute. The deed involved in *Marsh* was recorded in 1967. Our pure race recoding statute was adopted in 1968. But in the 1993 case of *Handler Construction, Inc. v. CoreStates Bank, N.A.*, this Court stated, "The foregoing fundamental rule of equity, long recognized by Delaware courts, is that 'a party taking title with notice of an equity takes subject to that equity.'"[19] That case involved a dispute between two mortgagees. The first mortgage lacked a seal and, for that reason, was deemed an equitable mortgage only.[20] The second mortgage holder (Handler Construction) had both constructive

---

[17] *Id.*
[18] *Id.* at 542-43.
[19] 633 A.2d 356, 364 (Del. 1993) (quoting John Adams, *The Doctrine of Equity* 151 (Robert Ralston, ed., 8th ed. 1890)).
[20] *Id.* at 363.

4

and actual knowledge of the first mortgage.[21]  One of Handler Construction's contentions was that an equitable mortgage was enforceable only between the parties to the equitable mortgage and foreclosure of that mortgage did not discharge a subsequently recorded mortgage.  This Court applied the principle that a party taking with notice of an equity takes subject to that equity in rejecting that contention.[22] *Handler* is distinguishable from this case in that it involved a dispute between the holders of two recorded mortgages.[23] This Court's assertion of the principle that a party taking with notice of an equity takes subject to that equity is, nonetheless, a forceful restatement of the rule, and the majority has not cited any case from this Court that has overruled the rule or found that the pure race recording statute has overruled it.[24]

The title agent for First American was well aware of the rule that one taking title to property with notice of an equity takes subject to that equity, as appears from the following email he wrote to counsel for 913 Market on September 14, 2016: "Rich – we still have the issue of the open 1st contract.  We can not close on the 2nd

---

[21] *Id.* at 366.
[22] *Id.* at 364-65.
[23] *See id.* at 358.
[24] *See, e.g.*, *E. Sav. Bank, FSB v. Cach, LLC*, 124 A.3d 585, 592 (Del. 2015) (finding, under the circumstances, "no equitable reason to set aside the provisions of Delaware's pure race recording statute").  Moreover, the North Carolina and Louisiana cases are inapplicable here because, among other reasons, the recording statutes in those states expressly apply to (and thus set the priority of) contracts to convey land.  *See* La. Civ. Code Ann. art. 3338(3); N.C. Gen. Stat. Ann. § 47-18(a).

contract w/o taking an exception (unless there is a formal release of the 1ˢᵗ contract)."[25]  The title agent explained the issue further in a later email:

> Rich – a couple of things to think about and give me a call:
>
> 1.  It is my opinion no title company will insure this deal without the exception we are taking.  Any other title company would know about the first contract from the Seller['s] Title Affidavit.
>
> 2.  To reiterate, if first buyer 'believes' Seller defaulted, he could sue for specific performance under the contract (which would result in the full purchase price/property being awarded if successful) – this is why we need the exception.[26]

The title agent's legal analysis is consistent with what I have always understood to be the law.

The attorney for 913 Market responded to the title agent's first email this way:

> Over 60 days have elapsed since closing was to have occurred under the initial contract.  The potential risk of a successful claim from a buyer that has been silent for over 60 days (even if time was not of the essence which is not the case here) cannot be substantial.  This is a situation involving a client that has done multiple closings with your firm, and we are sincerely disappointed that you feel as stated below.  Given the silence from the initial buyer our client will be proceeding against it to obtain payment of the deposit in accordance with its rights under the terminated contract.[27]

---

[25] App. to Appellant's Opening Br. at A-295.

[26] *Id.* at A-296.

[27] *Id.*  The majority refers to First American as Bathla's title insurer, which is true.  But it is also true that First American was brought into the transaction by 913 Market, and there are references in the record to a substantial business relationship between 913 Market and First American.

The attorney for 913 Market did not argue that there was no need for the new exception because the recording of Bathla's deed would cut off any possible claim from InvestUSA under the recording statute. Instead, he argued that there was no need for the exception because 913 Market had terminated the InvestUSA contract and the risk of InvestUSA asserting a claim against Bathla could not be substantial.

The title agent was unpersuaded by the argument of 913 Market's attorney and still considered the InvestUSA contract an encumbrance requiring an exception in the title policy. The record indicates that Bathla and his attorney learned that First American would be taking an exception for the InvestUSA contract on September 15, 2016, four days before the contractual settlement date. On September 18, Bathla's attorney wrote to the attorney for 913 Market and stated, "This new exception indicates that the Seller is unable to meet the condition precedent in Section 4.1(a) of the Agreement to convey the title subject **only** to the same exceptions as those listed in Seller's original title policy."[28] He also noted that his "client is still interested in purchasing the Property on the same terms and conditions contained in the Agreement" and requested "a short extension to resolve this issue."[29] It should come as no surprise to anyone that Bathla and his attorney would be alarmed to learn that First American planned on taking an exception for the

---

[28] *Id.* at A-134.
[29] *Id.*

InvestUSA contract. The attorney for 913 Market rebuffed the request for a short extension and took the position that if Bathla did not settle on September 19, he would be in default.

The recitals in Bathla's contract, although not entirely consistent with each other, describe Bathla's contract as a "backup" contract, to become a "primary contract" upon termination of the InvestUSA agreement.[30] Nothing in the record indicates that 913 Market provided Bathla with information showing a satisfactory termination of the InvestUSA contract or the circumstances explaining why that contract had failed to settle. The trial court's only comment on the status of the InvestUSA contract was: "for reasons not apparent here, InvestUSA failed to close on the property."[31] The exchange of correspondence by the attorneys on September 15 and 18 apparently resulted in a standoff that led to this litigation.

If an agreement of sale is executed and acknowledged with the intent that it be recorded in the Office of the Recorder of Deeds, as is often done with long-term installment sales agreements, I would agree that the priority of the agreement is subject to Delaware's pure race recording statute. In this case, the InvestUSA contract was un-recordable because it did not contain an acknowledgement. It is

---

[30] *Id.* at A-16.
[31] *913 Market, LLC v. Bathla*, 2017 WL 1507539, at *1 (Del. Super. Apr. 26, 2017). The trial court made no findings of fact concerning why the settlement between 913 Market and InvestUSA fell through. There are allegations in the record that Bathla did not settle because he could not get financing, but there are no findings of fact on that allegation.

8

common for agreements of sale which are expected to go to settlement in a relatively short period of time to lack an acknowledgement. I would find that a party taking title with notice of the outstanding equitable interest of a vendee in such an agreement takes title subject to that interest.

The issue in this case, as I see it, is whether the InvestUSA contract, which became an encumbrance when signed on June 15, 2016, was an encumbrance when the time came for settlement on the Bathla contract in September or whether, by then, the risk of litigation it presented had become so remote and improbable that it was no longer an encumbrance. I would reverse the judgment of the Superior Court and remand the case for further proceedings to include findings on this issue.