COURT OF CHANCERY
OF THE
STATE OF DELAWARE

PATRICIA W. GRIFFIN
MASTER IN CHANCERY

CHANCERY COURTHOUSE
34 The Circle
GEORGETOWN, DELAWARE 19947

Final Report: July 9, 2019
Draft Report: June 24, 2019
Date Submitted: April 23, 2019

Stephen A. Spence
Baird Mandalas Brockstedt, LLC
1413 Savannah Road Suite 1
Lewes, DE 19956

David J. Bever, Esquire
Barros McNamara Malkiewicz & Taylor, PA
2 West Loockerman Street
PO Box 1298
Dover, DE 19903

RE: *IMO The Estate of Helen L. Rose*
ROW F01052012HLR

Dear Counsel:

Pending before me are exceptions to the first and final accounting for an estate. The main issues are whether the executrix breached her fiduciary duties by selling the estate's real property to herself, and by paying off a loan debt of the estate to herself as a part of the property settlement. I find the executrix breached her fiduciary duty by selling the estate property to herself in a self-dealing transaction and recommend the Court surcharge the executrix by requiring either she pay the estate the difference between the sale price and the value of the

property or the sale to her will be voided. I also find the executrix had an equitable mortgage lien on the estate property, although the amount of the debt was less than the amount assessed against the estate. I recommend an award of the exceptants' attorney's fees, with the amount to be determined later, that the executrix be directed to pay attorney's fees incurred in defense of this action, and address other claims. This is a final report.

## I. Background

Helen Rose ("Decedent") executed her Last Will and Testament ("Will") on April 27, 2005, in which she named her stepdaughter, Patricia Rose, as executrix and ordered Patricia to sell her real property located at 801 West Mt. Vernon Street, Smyrna, Delaware ("Property"), "in whatever manner my Executrix, in her discretion, deems most appropriate and advisable," and after payment of the estate debts and of the specific bequests in the Will, to distribute the remaining proceeds "in accordance with [her] residuary clause."[1] She also devised $2,000.00 to her grandson-in-law or, if he predeceased the Decedent, to her granddaughter, Terri Fioravaniti; $10,000.00 to her granddaughter, Tammy Carlton, and $5,000.00 to her step-son or, if he predeceased the Decedent, to her granddaughter, Sara Rose.[2]

---

[1] Docket Item ("D.I.") 15, ¶ 4. I use first names in pursuit of clarity and intend no familiarity or disrespect. Citations to the trial transcript are in the form "Tr. #."

[2] *Id.*, ¶¶ 5-7.

2

The Decedent named her son, George Rose, her daughters, Mary Hilte, Doris Buckingham and Patricia, as equal residuary beneficiaries of her estate.[3] The Decedent died on January 5, 2012 and letters testamentary were granted to Patricia on or about January 10, 2012.[4]

Patricia submitted a claim against the estate related to monies she had loaned the Decedent under a promissory note ("Note") providing that Patricia would pay the Decedent $500.00 monthly from April 1, 2005 until the Decedent's death or through March 1, 2025, whichever occurred first.[5] The Note was secured by a mortgage ("Mortgage") on the Property. Both the Note and Mortgage were dated April 1, 2005.[6] There is no evidence that either document was recorded or notarized, and the copy of the Mortgage in evidence was signed by the Decedent and witnessed by her sister Mary.[7] The evidence indicates that Patricia's payments to the Decedent ended in November of 2011.

---

[3] *Id.*, ¶ 8.

[4] D.I. 13, ¶¶ 1, 2.

[5] D.I. 5, "Promissory Note," "Mortgage." Patricia testified that the Decedent needed money so, instead of her executing a reverse mortgage, Patricia agreed to give her $500.00 a month to help her with everyday expenses. Tr. 93:7-18. Patricia testified that the attorney set up the note for ten years, although the note reflects a 20-year term. Tr. 97:1; D.I. 5.

[6] D.I. 5.

[7] *Id.*

The inventory was filed on March 12, 2012.[8] Patricia listed the Property on the inventory with a value of $120,000.00, which she testified was what she estimated its value to be.[9] The evidence showed the Property was listed for sale in or around January of 2012 for $129,900.00, and remained on the market until December of 2012.[10] There were approximately ten appointments to show the Property while it was listed but those persons were turned away by George, who lived on the Property rent-free and refused to leave.[11] The Property was shown only twice and there was only one verbal offer for the Property at $90,000.00 within a couple of months after the Property was listed.[12] Patricia discussed the $90,000.00 offer with Mary and then turned it down.[13] After the listing expired with no additional offers, Patricia consulted attorneys about removing George from the Property, but did not take legal action to do so.[14] Patricia testified that George would not let them enter onto the Property, and the Property was not again listed

---

[8] D.I. 5.

[9] Exceptants' Tr. Ex. B; Tr. 13:13-16.

[10] Tr. 67:4-6. The realtor testified that the Property "needed new flooring, the kitchen needed updating, needed paint." Tr. 67:19-68:1. *See also* Tr. 15:13-17; 17:4-16; 68:8-9; Executrix's Tr. Ex. 1.

[11] Tr. 71:1-15; 124:15-18.

[12] Tr. 70:6-10, 20-22; 71:10-12; 82:14-19.

[13] Tr. 16:17-24. Mary testified that, once learning of the offer from Patricia, she contacted Doris, who indicated that she did not want to accept the offer because it was "too soon" and the Property had not been on the market that long. Tr. 82:9-19.

[14] Tr. 23:20-23; 37:10-14; *see* Exceptants' Tr. Ex. C.

for sale.[15] Patricia testified that she considered selling the Property to Mary but, when those efforts fell through, she sold the Property to herself for $80,000.00 on September 20, 2017.[16] Patricia discussed her purchase of the Property with Mary in advance, who consented to it, but the evidence did not show she discussed her purchase, or obtained approval for the purchase, with any other beneficiary.[17] During settlement, Patricia received $54,557.02 in credit for repayment of the balance on the Mortgage loan, and $5,196.60 in credit for tax and insurance payments.[18] George left when the Property sold and Mary moved in, with Mary working jointly with Patricia to make improvements on the Property.[19]

The first and final accounting for the estate was filed on July 6, 2018.[20] Exceptions were filed by Terri, Doris and Tammy ("Exceptants") on October 1, 2018, alleging that Patricia breached her fiduciary duties by neglecting the Property; failing to sell the Property and allowing their brother, George, to live in

---

[15] Tr. 103:10-14; 17:17-22.

[16] Tr. 23:23-24:5; Exceptants' Tr. Ex. D.

[17] Mary testified that she had discussed the earlier plan for Mary to purchase the Property with Doris. Tr. 83:3-21. And, that she has not spoken with Doris since before Patricia bought the house. Tr. 90:18-91:1. Terri and Tammy both testified that Patricia did not discuss her plan with them prior to purchasing the Property, and they only found out about the purchase in June of 2018, and would not have consented to her purchase. Tr. 59:8-21; 62:14-63:6.

[18] Exceptants' Tr. Ex. D.

[19] Tr. 42:24-43:10; 86:11-87:4; 107:16-20.

[20] D.I. 9.

the Property rent-free for more than five years, before selling the Property to herself at a price approximately $40,000.00 below its value; and by paying off an unsupported estate loan debt to herself as a part of the Property settlement. Exceptants seek relief either as payment representing the full value of the property, or the voiding of the sale to Patricia, disallowance of estate attorney's fees, closing costs and executrix's commission, an accounting of the loan payoff on the Note, and their attorney's fees and costs. Patricia responds that she did not breach her fiduciary duties—she sold the property to herself for the price that would have been obtained based upon a previous potential sale, handled the estate competently and the loan debt owed to her was supported. A hearing on the exceptions was held on April 23, 2019.

## II.   Analysis

Court of Chancery Rule 198 specifies the burden of proof in exceptions to an account.[21] Once exceptions are filed in compliance with Rule 198, the burden of proof falls on the executrix to demonstrate that the accounting was properly prepared.[22] That burden shifts, however, where the exceptant seeks a surcharge.

---

[21] Ct. Ch. R. 198.

[22] *In re Estate of Stepnowski*, 2000 WL 713769, at *1 (Del. Ch. May 2, 2000) (this "burden of proof reflects the fact that the administrator of the estate stands in a fiduciary capacity to the beneficiaries"); *see also In re Estate of Rich*, 2013 WL 5966273, at *1 (Del. Ch. Oct. 29, 2013).

In those instances, the exceptant "must demonstrate affirmatively that a surcharge is warranted."[23] Exceptions are addressed by issue below.

## A. Executrix's Purchase of the Property is Self-Dealing

The first issue is whether Patricia's purchase of the Property was a self-dealing transaction. To so hold, I need to find that Patricia owed and breached fiduciary duties to the estate. Patricia, acting as executrix of the estate, stands in the position of a fiduciary.[24] Her duty is to carry out the "wishes of the decedent as expressed in the will."[25] The Will charged her with selling the Property to pay the estate debts, funding the specific bequests in the Will, and distributing any remaining funds to the residuary beneficiaries. As a fiduciary, Patricia has a duty of loyalty requiring her to act, at all times, in the best interests of the estate, and is "under a duty not to sell to [herself] either by private sale or at auction, whether the property has a market price or not, and whether or not the [fiduciary] makes a profit thereby."[26] Under current Delaware law, self-dealing transactions are "voidable at the behest of the beneficiary."[27] A court "will uphold such a

---

[23] *In re Estate of Stepnowski*, 2000 WL 713769, at *1 n. 1.

[24] *Cf. Vredenburgh v. Jones*, 349 A.2d 22, 32 (Del. Ch. 1975).

[25] *In re Estate of Reichert*, 2001 WL 1398579, at *2 (Del. Ch. Oct. 31, 2001).

[26] *Stegemeier v. Magness*, 728 A.2d 557, 564 (Del. 1999); *Vredenburgh*, 349 A.2d at 33.

[27] *Pennewill v. Harris*, 2011 WL 691618, at *3 (Del. Ch. Feb. 4, 2011) (citing *Schock v. Nash,* 732 A.2d 217, 224-25 (Del. 1992)).

transaction against a beneficiary challenge only if the [fiduciary] can show that the transaction was fair and that the beneficiaries consented to the transaction after receiving full disclosure of its terms."[28]

Patricia's sale of the Property to herself was a self-dealing transaction. Such a transaction is voidable if challenged by a beneficiary, as it has been here. The presumption of invalidity can be overcome if Patricia shows that the transaction was fair and the beneficiaries gave their informed consent. I find Patricia has not met her burden and the transaction cannot be upheld.

Based upon the evidence, I cannot conclude that the transaction in which Patricia purchased the Property was fair. The evidence shows that Patricia sold the Property to herself for $80,000.00 on September 20, 2017. She testified she based the $80,000.00 sale price on the $90,000.00 verbal offer on the Property in 2012, minus reductions the realtor who listed the Property indicated would have been taken off at the sale.[29] Patricia argues she was taking a significant risk in

---

[28] *Stegemeier*, 728 A.2d at 563; *see also Vredenburgh*, 349 A.2d at 33 (explaining to overcome the invalidity of a self-dealing transaction, the fiduciary must show the "beneficiary to be Sui juris and that the fiduciary 'in his dealings is candid to the high degree required in such confidential relationships, and further provided that the transaction is in fact fair and reasonable'" (citation omitted)).

[29] Patricia testified the $80,000.00 purchase price was determined by considering the $90,000.00 offer and reducing that amount by the $9,000.00 to $10,000.00 in deductions that the realtor indicated would be taken out. Tr. 104:15-21. She, however, was "not sure" whether the expenses she deducted were paid when she ultimately purchased the Property, but knew that any real estate commission was eliminated. Tr. 104:22-105:4.

purchasing the Property without seeing the inside of the house because George lived in the house and prevented her from entering the house. She testified that the condition of the Property when she bought it was poor and that she and Mary made improvements on the Property, which included putting in all new hardwood and tile floors, replacing toilets, and addressing plumbing and electric issues.[30]

However, other evidence indicates the Property had a much higher value than what Patricia paid for it in September of 2017. It had been listed for sale in or around January of 2012 for $129,900.00, and, although there was only one verbal offer on the Property for $90,000.00 during the year that it was on the market, the evidence shows interest in the Property was stymied by George, who turned potential buyers away from the Property. The realtor who listed the Property testified that the Property's condition was not very good in 2012, and the listing

The realtor's statement of "estimated net proceeds" showed deductions of $8,743.00 if the Property sold for the listing price of $129,900.00, including $1,948.00 in transfer tax, $300.00 in deed prep, and $6,495.00 in real estate commission. Executors' Tr. Ex. 1. Since the tax and commission amounts are based on percentages of the sale price, those costs, and the deductions, would have been significantly less with a $90.000.00 sale price.

[30] There was testimony that the utilities (water and electric) were turned off while George lived at the Property, causing substantial problems with the Property's condition. Tr. 108: 2-18. Patricia testified that she and Mary made approximately $11,000.00 in improvements to the Property following her purchase. Tr. 110:12-14. As proof, she entered into evidence a number of receipts she claimed were expenditures for improvements. Executrix's Tr. Ex. 3. However, she offered no testimony detailing what the items listed on the receipts were used for; some of the receipts were illegible, and other receipts were for items, such as furniture, that would not be considered improvements.

price reflected that condition, as well as the attractiveness of the Property's location.[31]

And, the Property was appraised at $128,000.00 as of January 25, 2019, with the notation that the Property is a "30 year old home in overall average condition by local market standards."[32] Contrary to Patricia's claims that the improvements she made following her purchase of the Property greatly enhanced its value, the appraiser testified that improvements, such as new flooring, do not add substantial value to the Property but contribute to the overall condition.[33] And, as executrix, Patricia was responsible for protecting the Property against damage caused by George and cannot claim that damage, which was worsened by her inaction, to justify selling the Property to herself for a lower price.[34]

The evidence supports a finding that the Property's actual value at the time of Patricia's purchase far exceeded the $80,000.00 purchase price, given its valuation on the inventory at $120,000.00, its $129,900.00 listing price in 2012,

---

[31] The realtor testified the Property was located in the Smyrna School District, where there is limited availability. Tr. 76:3-8.

[32] Exceptants' Tr. Ex. F.

[33] Tr. 56:15-23.

[34] The evidence indicates that the underlying family relationships are fractured, with various family members not speaking to each other. I do not doubt that Patricia's efforts to administer the estate were hindered by these challenges. And, she may have felt she was doing the best she could, given the circumstances; despite her intentions, she did not satisfy the fiduciary obligations that she took on when she agreed to act as executrix.

10

and its $128,000.00 appraised value approximately one year after the sale.[35] There is no value of the Property in evidence as of the time Patricia purchased it. Since it is Patricia's burden to show the value was fair, and she has not provided evidence of the Property's value at the time of purchase, nor to support her claim that the Property's value was increased by the improvements she made following the purchase, I find it reasonable to set the Property's fair value at the time of purchase at $128,000.00.[36] The damage to the estate caused by Patricia's self-dealing is $48,000.00 (the difference between the $128,000.00 value and the sale price of $80,000.00).

In addition to showing the fairness of the transaction, to overcome the presumption of invalidity with a self-dealing transaction, Patricia also needed to show the beneficiaries gave their informed consent to the transaction. Here, the only estate beneficiaries who had notice of Patricia's purchase were Mary and

---

[35]Although the listing price was set five years prior to the sale, it was based upon the realtor's assessment of similar properties for sale in the area and recognized the Property's poor condition at that time. Also, for background purposes, the homeowners insurance policy on the Property, which was effective between August 8, 2013 and August 8, 2014, valued the Property at $143,000.00. D.I. 5.

[36] Patricia did not sufficiently prove the expenditures on improvements so that those expenditures could be factored in. *See* n. 30, *supra*. An exception is Patricia's purchase of a $494.10 shed for the Property. Executrix's Tr. Ex. 3. If the sale of the Property is voided, Patricia may remove the shed from the Property, so long as it can be removed without causing damage to the Property. Further, since her purchase of the Property, Patricia has had exclusive possession of, and benefitted from the use of, the Property, so payments she made for improvements could be seen as an offset for that use. *See* Tr. 43:3-16.

Patricia herself. There was no evidence that the remaining estate beneficiaries—Tammy, Terri, Doris, Sara, or George—were notified about, or consented to, the sale.[37]

Accordingly, I conclude Patricia has engaged in self-dealing and that her purchase of the Property is voidable. Exceptants seek relief either as payment representing the full value of the property, or the voiding of the sale to Patricia. I recommend the Court order Patricia to either refund the estate $48,000.00 within 60 days after my report becomes final, or if she fails to do so or notifies the Court that she will not pay the difference within the same time frame, void the sale of the Property.

## B. Executrix's Equitable Lien on the Property

The second issue is whether the loan debt arising from the Note held by Patricia is sufficiently proven and whether it is secured by a valid mortgage lien against the Property. Exceptants claim the loan debt was unsubstantiated and, in addition, was unfairly paid off in advance of other estate debts.

A mortgage "is a conveyance of an estate, by way of pledge for the security of debt, and to become void on payment of it."[38] "The *sine qua non* of a

---

[37] Mary testified that she had spoken with Doris about her possibly purchasing the Property, but it is not clear that Mary spoke with Doris specifically about Patricia purchasing the Property nor that Doris consented. *See* Tr. 83:3-17; 90:18-91:4.

[38] *Handler Const., Inc. v. CoreStates Bank, NA*, 633 A.2d 356, 363 (Del. 1993).

'mortgage' is not the form of the document but the intention of the parties to secure a debt with a pledge of real property."[39] The Delaware Supreme Court recognized the Court of Chancery's "equitable power to disregard defects in the execution of a mortgage," based upon the principles that "(1) equity regards substance rather than form," and (2) "equity regards that as done which in good conscience ought to be done."[40] Further, Delaware's "form of mortgage" statute expressly states that "documents not conforming with its prescribed pattern may nevertheless be valid and fully effectual."[41] Technical defects, such as the failure to acknowledge the mortgage before a notary or to record it, do not necessarily invalidate the mortgage.[42] The key to establishing an equitable mortgage is the intent of the parties to create a mortgage or lien on secured property.[43] Substance transcends form and instruments intended as mortgages to pledge property to secure debts are

---

[39] *Id.* (citation omitted).

[40] *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983); *see also Handler Const., Inc.*, 633 A.2d at 363; *OneWest Bank, FSB v. Feeney*, 2013 WL 5977066, at *6 (Del. Ch. June 27, 2013).

[41] *Handler Const., Inc.*, 633 A.2d at 363 (citing 25 *Del. C.* § 2101(c)).

[42] *Mitchell v. Church*, 2008 WL 4409461, at *2 (Del. Super. Jan. 31, 2008) ("the law does not require that a mortgagor's acknowledgment has to be notarized in order to make the mortgage valid"); *Borders v. Townsend Assocs.*, 2002 WL 725266, at *4 (Del. Super. Apr. 17, 2002) ("an acknowledgment [of a mortgage] is not substantive . . . [and] 25 *Del. C.* § 132 cures an imperfect acknowledgment). And, the recording of a mortgage determines its priority over other liens, not its validity. *E. Savings Bank, FSB v. Cach, LLC*, 124 A.3d 585, 589 (Del. 2015) ("the time of recording is determinative of the priority of competing creditors").

[43] 59 C.J.S. Mortgages § 36 (June 2018 Update).

13

enforceable as equitable mortgages, even if they are not regarded as legal mortgages because of defects.[44]

Neither the Mortgage nor the Note were recorded or notarized. But the evidence shows that the Decedent executed the Mortgage intending to create an equitable lien on the Property, and that Patricia paid $500.00 per month to the Decedent from April of 2005 through November of 2011 under the Note.[45] The loan amortization schedule submitted with the Note and Mortgage to the Register of Wills related to Patricia's claim indicates that, as of November of 2011, the balance owed by the Decedent to Patricia on the loan would have been $47,447.74.[46] However, the settlement sheet for Patricia's purchase of the

_____

[44] 59 C.J.S. Mortgages § 45 (June 2018 Update) (noting that an equitable mortgage can be enforced where the defect in the mortgage is that "it is not recorded . . .; it lacks a seal; it is not signed by the mortgagor, provided that it is otherwise regular and is duly acknowledged by him or her; it is not acknowledged according to the requirements of the law").

[45] *See* Executrix's Tr. Ex. 2; Tr. 39:5-15. Under the terms of the Note, the $500.00 monthly payments would terminate upon the Decedent's death or March 1, 2025, whichever occurred first. D.I. 5, Note, ¶ 2. The Decedent died in January of 2012, but there was no evidence of payments made by Patricia to Decedent after November of 2011. Patricia provided copies of bank statements from 2005 and 2007 that reflected more than one $500.00 payment each month (and failed to provide proof as to who those checks were made out to). Executrix's Tr. Ex. 2. She also provided copies of monthly checks to the Decedent between January of 2008 and November of 2011 (except for April of 2010). *Id.* Although not complete, I find the evidence sufficient to conclude Patricia made monthly payments to the Decedent under the Note from April of 2005 through November of 2011.

[46] $47,447.74 represents the balance due on the loan in the amortization schedule after the monthly payment in November of 2011. D.I. 5, "Amortization Schedule."

14

Property shows that $54,557.02 was deducted from the amount due the estate on that loan.[47] When asked about the discrepancy, Patricia testified that, at settlement, "interest and taxes and insurance" were added together with the amount owed on the Note to make up the $54,557.02 as a single line item on the settlement sheet.[48] However, the settlement sheet shows Patricia was also credited for the payment of $5,196.60 in taxes and insurance separately from the outstanding loan.[49]

I find the Mortgage was an equitable mortgage against the Property securing Patricia's loan debt under the Note. And, it is reasonable to conclude that the estate owes Patricia the $54,557.02 assessed against the estate related to the loan, including taxes, insurance and interest. However, I find the settlement sheet incorrectly assessed an additional $5,196.60 against the estate for taxes and insurance, when Patricia's testimony shows that those expenses were already included in the $54,557.02 calculation, and I add $5,196.90 to what Patricia is required to pay the estate, if she pays the surcharge.

## C. Exceptants' Other Claims

Exceptants' other claims focus on Patricia's neglect of the Property while allowing George to live in the Property rent-free for more than five years, and the

---

[47] Exceptants' Tr. Ex. C. Oddly (and, perhaps, coincidentally), $54,557.02 reflects the balance due on the loan as of September 1, 2012. D.I. 5, "Amortization Schedule."

[48] Tr. 97:7-98:10.

[49] Exceptants' Tr. Ex. D.

additional relief they seek include the disallowance of estate attorney's fees, closing costs, commissions, and attorney's fees and costs. Patricia alleges that George refused her entry on the Property while he lived there so she could not maintain the Property. As a fiduciary, her obligations included taking care of the Property and taking appropriate actions to remove George from the Property, which should have taken far less than five years to do so. I recognize the difficulties Patricia experienced in her efforts to remove George from the Property, including the legal advice she received from one attorney and the cost of hiring a different attorney to take legal action. And, Exceptants have not provided evidence of damages caused by neglect. Further, since I recommend to the Court that, to remedy her self-dealing, Patricia be ordered to either pay the difference in value or return the Property, any damages resulting from neglect will be addressed.[50]

With regard to Exceptants' request to the Court for the disallowance of estate attorney's fees, "[t]he general rule is that fees paid to the attorney for the personal representative are considered an expense of the estate."[51] "The rational[e]

---

[50] This is an issue for another day, but I find the evidence shows George benefited from his exclusive possession of the Property rent-free for more than five years, and the reasonable value of that benefit can be deducted from George's share of the estate, if there are residuary funds remaining in which he would share as a residuary beneficiary.

[51] *In re Estate of Pusey*, 1997 WL 311503, at *3 (Del. Ch. May 23, 1997).

behind this rule is that the personal representative and his or her attorney is providing a service to the estate and its beneficiaries by properly and efficiently administering the estate."[52]  When an executrix breaches her fiduciary duty, she may be found to be acting in her own best interest rather than to benefit the estate, and ordered to pay her own attorney's fees.[53]  Here, the exceptions focused on Patricia's self-dealing, which benefitted herself not the estate.  I find that, through her self-dealing, she breached her fiduciary duty.  It would be unfair to shift the legal fees incurred for her defense of this litigation to the estate, and the other beneficiaries.  Accordingly, I recommend the Court direct Patricia to pay her own legal fees in defense of this action.

With regard to Exceptants' request for the disallowance of the closing costs associated with the sale of the Property to Patricia, I recommend the Court deny that claim if Patricia pays the estate for the difference between the value of the Property and her purchase price.  However, if, in the alternative, the sale of the Property to Patricia is voided, then I recommend the Court assess against Patricia $8,209.44 in settlement charges previously paid by the estate.[54]  Exceptants also

---

[52] *Id.*

[53] *See In re Estate of Reichert*, 2001 WL 1398579, at \*2-\*3 (Del. Ch. Oct. 31, 2001).

[54] Patricia's reimbursement of these charges is appropriate to prevent the estate from incurring duplicative attorney's fees (which represented $3,200.00 of the settlement charges and I assume were incurred related to the settlement) when the Property is resold,

sought disallowance of any commissions sought by Patricia. But, commissions are not at issue since the first and final accounting does not provide for any commission for Patricia.[55]

Finally, Exceptants ask the Court to award them reasonable attorneys' fees and costs. The standard for awarding attorneys' fees in litigation by the Court of Chancery is well-established, with litigants, typically, paying their own attorney's fees and expenses under the American Rule.[56] Similarly, the "fees paid to an attorney representing one of the beneficiaries are [ordinarily] paid by that individual, not the estate."[57] But, estate administration and will contests are areas where attorney's fees have been awarded.[58] To justify a shifting of fees onto the estate, the circumstances must be "exceptional" and demonstrate "special equities

---

and because estate debts (in the amount of $5,009.44) were paid off during settlement and charged against the estate to Patricia's benefit – reducing the amount she had to contribute at settlement. *See* Exceptants' Tr. Ex. D.

[55] Exceptants' Tr. Ex. E.

[56] *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998); *Tandycrafts, Inc. v. Initio Partners,* 562 A.2d 1162, 1164 (Del. 1989).

[57] *In re Estate of Pusey*, 1997 WL 311503, at *4 (citations omitted); *see also In re Melson*, 1999 WL 160136, at *8 (Del. Ch. Mar. 10, 1999), *aff'd,* 741 A.2d 1027 (Del. 1999). The award of reasonable attorney's fees against the estate may be allowed even to losing litigants in will contests where exceptional circumstances are present and the litigants' actions have benefited the estate. *See Ableman v. Katz*, 481 A.2d 1114, 1117-20 (Del. 1984), *overruled on other grounds by In re Will of Melson*, 711 A.2d 783 (Del. 1998); *In re Will of Kittila*, 2015 WL 3899572, at *2 (Del. Ch. June 24, 2015); *In re Estate of Melson*, 1999 WL 160136, at *8 (Del. Ch. Mar. 10, 1999), *aff'd,* 741 A.2d 1027 (Del. 1999); *In re Macklin*, 1991 WL 67799, at *2 (Del. Ch. Apr. 17, 1991).

which would make a failure to shift the burden onto the estate unfair."[59] Attorney's fees for beneficiaries challenging the administration of the estate can be assessed against the estate if their challenges are made on good grounds and serve to "potentially benefit the estate as a whole by ensuring that it will be administered in the manner intended by the testatrix."[60] "Whether exceptional circumstances exist sufficient to warrant an award of fees and costs is a matter which must be determined by an *ad hoc* examination of the facts of the particular case."[61] Here, I recommend the Court award the Exceptants' attorney's fees from the estate. Not only were Exceptants successful in their challenge to Patricia's self-dealing transaction as executrix, but that challenge will potentially result in a benefit to the estate as a whole, and an increase in estate assets available to be distributed among the beneficiaries. Exceptants have shown exceptional circumstances benefiting the estate and it would be unfair if the costs associated with that challenge were not absorbed by the estate.

---

[58] *In re Tunnell & Raysor, PA v. Truitt*, 1997 WL 257440, at *1 (Del. Ch. May 9, 1997).

[59] *Scholl v. Murphy*, 2002 WL 31112203, at *3 (Del. Ch. Sept. 4, 2002).

[60] *Id.*

[61] *Speed v. Palmer*, 2000 WL 1800217, at *1 (Del. Ch. Nov. 28, 2000); *see also In re Estate of Pusey*, 1997 WL 311503, at *4 ("whether the estate or the individuals ought to bear the cost of the attorneys' fees is a determination which depends largely on the facts of the case").

An issue remains, however, as to the amount of the award in light of the small size of the estate. "Delaware courts have compared the relative size of the estate to the amount of the fee request."[62] Exceptants have not indicated how much they seek in attorney's fees. Once that information is available and considered in light of the size of the estate, I may conclude that the estate should pay only a portion of Exceptants' fees. Exceptants should submit a fee petition within 20 days of the date of this report, the estate should file its response within 10 days of the filing of the fee petition, and Exceptants should file their reply within 5 days of the filing of the estate's response. I will then incorporate my finding regarding Exceptants' attorney's fees into my report.

## III. Conclusion

For the reasons set forth above, I find Patricia Rose breached her fiduciary duty by selling estate real property to herself in a self-dealing transaction and recommend the Court order her to pay the estate $48,000.00, the difference between the sale price and the value of the Property, within 60 days after my report becomes final. Alternatively, if she fails to do so or notifies the Court that she will not pay the difference within the set time frame, I recommend the Court void the

---

[62] *In re Will of Kittila*, 2015 WL 3899572, at *2 (citation omitted); *In re Estate of Damico*, 2011 WL 1938567, at *13 (Del. Ch. Apr. 21, 2011) (citing *In re Estate of Newell,* 1977 WL 23836, at *2 (Del. Ch. Dec. 20, 1977) ("[F]ees should not be awarded in such an amount as to virtually dissipate the estate.").

sale of the Property. I also find Patricia had an equitable lien on the estate property, although the amount of the debt owed by the estate was $5,196.60 less than the amount assessed against the estate during settlement. I recommend that the Court order Patricia to pay the estate $5,196.60 for the difference. Further, I recommend the Court conditionally deny Exceptants' request to disallow closing costs, with the condition that Patricia would be responsible for the $8,209.44 in settlement charges previously paid by the estate if the sale of the Property to Patricia is voided. Considering the claims together, if Patricia pays the estate the difference between the sale price and value of the Property, she will be responsible for paying a total of $53,196.60, including $48,000.00 (the $128,000.00 value minus the $80,000.00 purchase price) and $5,196.60 (a refund for the estate's double payment in taxes and insurance at settlement), to the estate.[63] If the sale of the Property to Patricia is voided, then the estate owes her $46,237.58, which is secured by an equitable lien on the Property, and represents $54,447.02 (the amount due her on the mortgage loan on the Property) minus $8,209.44 (a surcharge for settlement charges previously paid by the estate).

Finally, I recommend the Court direct Patricia to personally pay the attorney's fees that the estate incurred in defense of this action, and cause the estate

---

[63] This amount should be reduced by any estate funds she would otherwise have received as a residuary beneficiary.

to pay Exceptants' attorney's fees, but defer the decision on the amount of attorney's fees to be awarded pending supplemental submissions by the parties. This is a final report and exceptions may be taken pursuant to Court of Chancery Rule 144.

Respectfully,

/s/ Patricia W. Griffin

Patricia W. Griffin
Master in Chancery